Statement of the Case.
MONROE, J.
Plaintiffs, as the heirs direct, or by representation, of John George, Jr., and Sarah George, his wife, ask to he recognized as owners of a tract of land in the parish of St. Helena, containing 446.18 acres, and pray that certain titles relied on by the defendants, the widow and heirs of John G. Cole, deceased, be decreed void. The defendants claim to have acquired the property which forms the subject of the litigation from the state, either directly or through mesne conveyances, and they plead various terms of prescription, and call W. S. Hutchinson and the heirs and widow of Albert O. Dean, deceased, in warranty.
The facts disclosed by the record are as follows to wit: In 1806 John George, Jr., the ancestor of the plaintiffs, settled upon certain land in this state; in 1820 his title, based upon actual settlement, was confirmed, in general terms, by the government of the United States; and in 1825 the land was surveyed, by a government surveyor, and designated as sections 50 and 3, townships 4 and 5, range 6 east, containing 630 acres, and the plat of the survey was duly registered. The upper part of the headright thus acquired, containing 204.50 acres, lies in the parish of St. Helena, having for its southern boundary the line which separates that parish from the parish of Livingstone, and, together with 241.68 acres, adjoining it to the north, being the southern portion of section 49, township 4 south, range 6 east, constitutes the tract about which this litigation has arisen. The section 49 referred to was acquired by Freeman George, by confirmation of title, survey, etc., similar to that by which John George, Jr., acquired sections 50 and 3; and in 1824, John George, Jr., purchased said section 49 from Freeman George, moved his residence thereto, and continued to live thereon until his death, in 1837; the two headlights thus forming one undivided estate, under the dominion of the resident owner. At his death John George, Jr., left a widow and six sons and daughters, or their representatives, and the widow, with some, though probably not all, of the family, continued to live in the home thus established.
In February, 1845, Henry Leonard, auctioneer, acting under an order made by the probate court in the matter of the succession of John George, Jr., deceased, directing him to “make sale, to the highest bidder, of all the undivided property belonging to the succession of said deceased, in community with the widow, Mistress Sarah George,” adjudicated to Mistress Sarah George “the tract of land, containing six hundred and forty acres, being the last residence of the deceased, bounded north by William George, east by vacant lands, south by other lands of said succession, and west by the river Tickfaw”; as also a tract of land on the west side of the Tickfaw, and a lot of live stock,'farming implements, household furniture, forage, etc. “A bureau and an old steer” were adjudicated to other bidders, and the procés verbal of the auctioneer then recites that there was no *819 other property offered, “except the tract of land adjoining the aforesaid tract of land on which the deceased last resided, and which, having been offered two separate times by me, said auctioneer, and finding no bid to the appraised value of the same, I have closed these proceedings,” etc. The sale to the widow was made, partly, on terms, and, upon the same day, she executed, before the probate judge, as ex officio notary public, a mortgage upon the land purchased by her, to secure the payment of her notes, given in liquidation of the unpaid balance of her several bids. So far as the record shows, no further change took place until September 18, 1866, when Mrs. George sold to her son, Charles W. George, the tract of land which she had purchased on the west side of the Tickfaw, and, as the deed recites, “four hundred acres of the home tract, upon which she now resides, bounded north by the tract belonging to William George, east by public lands, west by Tickfaw river, and south by the remaining portion of the section from which the four hundred acres is taken, by a line to be run from Tickfaw river, in a southeasterly direction, to the north and south line on the east, so as to give all the improvements to this purchaser, * * * and the said Charles W. George obligates himself to take care of this vendor and allow her to remain on the premises of the home tract during her natural life,” etc. In January, 1876, Mrs. George died, leaving a will whereby she bequeathed the disposable portion of her estate to her son Charles, and appointed him executor, with full seisin and possession. Toward the close of the year 1876 the succession was opened, and in January, 1877, the executor qualified and received letters testamentary, and the will was ordered to be registered and executed. In March following an inventory was ordered to be taken, which, besides live stock, household furniture, etc., included immovable property, described as follows:
“1st. Four hundred acres of land on the river Tickfaw, being part of the home tract, bounded north by lands of C. W. George, east by public lands, south by section No. -belonging to said succession, and west by the river Tickfaw,” etc.
“2nd. Four hundred and thirty acres of land on the river Tickfaw, bounded north by the above-mentioned land, east by vacant lands, south by lands owned by William George, west by the river Tickfaw,” etc.
It does not appear that the executor, thus appointed, and thus vested with seisin and possession, has ever been discharged; that he has ever surrendered his possession; or that any other person has ever had actual possession of the lands here claimed, which are wild lands, intended to be included in the foregoing description of immovable property inventoried as belonging to the estate of the decedent.
The answer of the defendant contains the following, among other, averments as to title, to wit: “That George H. Vernon purchased the tract of land herein involved at a tax sale made April 2, 1881, pursuant to Act No. 107 of 1880, providing for the sale of lands sold or forfeited to the state of Louisiana for delinquent taxes, and that said land was forfeited and adjudicated to the state December 11, 1877, for delinquent taxes, for the years 1874, 1875, and 1876, of the estate of Sarah George, the true owner and possessor of said land. They show that said tax title of said George H. Vernon has been lost or mislaid, or destroyed, and cannot be found, after diligent search. * * * That they acquired a portion of said land at a tax sale, made May 5th, 1883, and a portion February 26, 1887, from W. S. Hutchinson, co-purchaser, jointly, at said tax sale, and the remaining portion July 31, 1886, from A. O. Dean, deceased, who purchased the same from George H. Vernon May 5, 1883. And they allege that they, or their authors, have been in actual, peaceable, and uninterrupted possession of said land since May 5, 1883, in good faith and under a just title, translative of property, valid in form and duly recorded.”
The evidence shows that upon December 11, 1877, the tax collector for the parish of St. Helena made an adjudication, the procés verbal of which contains the following, among other, recitals, to wit: “Whereas I, William J. Parker, state tax collector, * * * by virtue of the power in me vested by law, and in accordance with section 53 of the act No. 96, * * * approved April 20, 1877, and having made the necessary publications and advertisements, to wit, in three public places in the parish of St. *821 Helena, said publications having been made on the twelfth of November, 1877, and. having complied with all the formalities required by, and specified in, the act aforesaid, did expose, at public auction, on the 11th day of December, 1877, at the door of the courthouse in the parish of St. Helena * * * the following described property, to wit: A certain tract of land in St. Helena parish, containing seven hundred acres (700), bounded north by Charles W. George, east by public lands, south by Nicholas George, and west by Tickfaw river.”
“The same having been seized and sold for taxes due by Mrs. Sarah George, as owner thereof, according to the tableau and assessment rolls for the year 1876, at which sale the state of Louisiana, residing in-, being the last and highest bidder, the said property was adjudicated to the state for the price and sum of sixty-four dollars and five cents, which I hereby acknowledge to have received as follows,” etc.
The collector then proceeds to attribute the supposed proceeds of his bid, partly to the taxes of 1876, in satisfaction of which the sale purports to have been made, and partly to the taxes of 1874 and 1875, and, otherwise, to costs, charges, etc.
Delinquent lists in the name of Mrs. Sarah George for the years 1874 and 1875 appear to have been recorded in the office of the parish recorder in January and December, 1876, respectively, and other lists, in the name “Estate Mrs. Sarah George,” for the years 1877 and 1878, were recorded in the same office in January, 1879, and January, 1880, respectively; but, save for the recitals contained in the adjudication above referred to, it does not appear that any assessment roll for the year 1876 was ever prepared or recorded, and it is shown, affirmatively, that no delinquent list for that year was ever filed in said office, and it is further shown that the procés verbal of said adjudication, of December, 1877, was not so recorded until ¿.August 24, 1900.
) There is evidence (admitted over the objection that sufficient foundation had not been laid for the introduction of parol testimony) going to show that upon April 23, 1881, property described in the same, or approximately the same, terms as those used in the procés verbal above mentioned, was adjudicated to George H. Vernon, as having been previously forfeited, or sold, to the state, for taxes of 1874, 1875, 1876, 1877, 1878, assessed in the name of “George, Mrs. Sarah, Estate,” but that, for the years 1881 and 1882, said property was assessed to George W. Vernon, Jr. It was, however, advertised, in April, 1883, as the property of George H. Vernon, for the taxes of 1881 and 1882, and 600 acres, as so described, was sold, pursuant to the advertisement, upon May 5, 1883, for $16.62, to John G. Cole and W. S. Hutchinson, whilst the supposed remainder of the tract, said to consist of 100 acres, was sold, upon the same day, for $16, by George H. Vernon to Albert C. Dean; and Hutchinson and Dean finally sold to Cole the interests which they are said thus to have acquired.
There is no evidence sufficiently definite to establish the date of the marriage between John George, Jr., and Sarah George; but it appears that the latter and her children have alw.ays dealt with the entire estate upon the theory that it belonged to the community, and there are indications in the record to the effect that a settlement, by partition or otherwise, may, at some time in the past, have been effected between Mrs. George, her son Charles W. George, and the coheirs of the latter; and Charles W. George appears in this proceeding for the purpose of admitting that he has no interest in the property here claimed, it being admitted by the defendants that the plaintiffs before the court include all the other heirs of John and Sarah George.
In 1883 John G. Cole paid taxes, amounting to $1.05, on land described as “% interest in 600 acres (which is 300 acres) bounded north by George, E. by entries, S. by Dean, W. by Tickfaw river.” In 1887 he paid $2.35 on “300, one-half of 600, N. by George, E. by entries, S. by Ph. line, W. by Tickfaw river.” In 1888 he paid $9.10 on “700 acres of land, N. by George, E. by entries, S. by Ph. line, W. by Tickfaw river.” And in 1889, 1890, 1891, 1892, 1893, 1894, 1895, 1896, 1897, 1898, 1899, 1900, he paid $3.20, $2.60. $2.80, $3.00, $2.80, $2.80, $2.80, $2.87, $2.87, $2.94, and $5.60, respectively, on land described as “204.11/4 acres. See. 50, T. 4 S., R. 6 E.”
W. S. Hutchinson appears to have been assessed for 1883 on “y2 600, Vernon tract, N., George; E., entries; S., Dean; W., Tick *823 faw”; for 1884 on 600, N„ George; E., entries; S., P. line; W., Tiekfaw”; for 1885 on “300 (y2 600), N., George; E., entries; S., Dean; W., Tiekfaw”; for 1886 on “300 (y¡ 600), N., O. W. George; H., entries; S., P. line; W., Tiekfaw”; but, so far as we are informed, he paid no taxes on the property so assessed. Nor does it appear that any other taxes, which could be considered as bearing upon the property in dispute, have been paid since 1882. John G. Cole, upon February 26, 1887, for $80, purchased “all the rights, title, and interest, and claim” of Hutchinson in and to “a certain tract of land, situated in St. Helena, La., the undivided half of six hundred acres, bounded north by land of C. W. George, east by public lands, south by the parish line, and west by the Tiekfaw river,” and the act proceeds: “To have and to hold said property unto said purchaser, his heirs and assigns, own use and behoof forever. Vendor hereby subrogating all his rights and actions in warranty he has against his own and preceding vendors, with authority to exercise the same according to law.” And upon July 31, 1886, for $10, by an act containing similar recitals, he acquired from Albert C. Dean “a certain tract of land, with all improvements thereon, situated in St. Helena, La., containing one hundred acres, and bounded on the north by lands of Cole and Hutchinson,, east by public lands or unknown lands, south by William George and Ph. line, and west by Tiekfaw river,” etc. Cole’s original disbursement having been one-half of $16.62, or $8.31, it follows that, including the amounts paid to Hutchinson and Dean, and in the way of taxes, he and his heirs have paid altogether $147.44, on account of the 446.18 acres of land claimed by the plaintiffs, which are said to be worth, at this time, about $5 per acre.
Opinion.
It is established beyond question that the plaintiffs’ deceased ancestors owned the land in controversy; that they never, voluntarily, divested themselves of their ownership; that plaintiffs are the only persons entitled to claim said property by inheritance; and that they have never, voluntarily, divested themselves of their rights as such heirs; and it follows that, unless the title of their ancestors was divested by some proceeding in invitum, or unless the title which they may have inherited has been so divested, the plaintiffs are now the owners of said land, and are entitled to be so recognized. The defendants claim that the land “was forfeited and adjudicated to the state December 11, 1877, for delinquent taxes, for the years 1874, 1875, and 1876, of the estate of Surah George, the true owner and possessor,” etc., and that it was, thereafter, upon April 2, 1881, sold by the state, under Act No. 107 of 1880, providing for the sale of lands sold, or forfeited, to the state, for delinquent taxes, and was acquired by them from the vendees at said sale.
If it be true that the title of plaintiffs’ ancestors was divested by forfeiture, or adjudication, as alleged, and vested in the state, it can make no difference to plaintiffs whether the proceeding by which the state subsequently parted with the title so acquired was legally conducted or not. Upon the other hand, if neither the title of the plaintiffs’ 'ancestors, nor the title which they may have acquired, had been so divested, and the state had acquired no title, prior to its alleged sale of the property, under act No. 107 of 1880, it follows that such sale was void, and that the defendants, claiming thereunder, without having been, at any time, in actual possession of the property, have no standing to resist the plaintiffs’ demands.
It will be observed that the “forfeiture and adjudication,” upon which the defendants specifically rely, are said to have taken place upon December 11, 1877, as the results of proceedings to enforce the payment of delinquent taxes “of the estate of Sarah George” for the years 1874, 1875, 1876. But, allowing the defendants all the latitude they ask with respect to the date of such forfeiture or adjudication, it is not claimed that the proiDerty was ever forfeited, or adjudicated to the state for any taxes prior to those of 1874. We shall, therefore, inoceed with the inquiry upon that basis.
It is nowhere suggested that the property in question belonged, originally, to the separate estate of Sarah George. It was acquired by, and in the name of, John George, Jr., her husband; and, although there is evidence tending to show that part of it might have belonged to his separate estate, yet, in the absence of satisfactory evidence as to the *825 date of his marriage, and in the presence of evidence that, after his death, the whole of it was treated as community property, we conclude that it should he held to have belonged, originally, to the community. The 241.68 acres lying in section 49, and constituting part of the home tract, were, however, purchased by Mrs. George at the probate sale, in 1845, whilst the 204.50 acres lying in sections 50 and 3 were offered at the same time, as community property, but were not sold, for lack of bidders. So far as appears from the record, therefore, Mrs. George, from 1845 until she died, in 1876, owned the tract first above mentioned, and enjoyed the usufruct of the other, as surviving partner in community; and she resided on the home tract, between which and the other there was only an imaginary line, so that both tracts may fairly be held to have constituted one estate. It is true that Mrs. George sold part of this estate to her son Charles W. George, but by the same act she retained her right to reside upon the property sold, and cannot be said to have abandoned her possession of the part which remained unsold. It would therefore appear that, during her life, the land in section 49 should have been assessed to her, and the tract in sections 50 and 3 to the estate of her husband. The whole of it was, however, assessed in her name while she lived, and after her death, in January, 1876, was inventoried as belonging to her estate, but was, nevertheless, assessed, if assessed at all, to her, as though she were still living, and, in December, 1877, nearly two years after her death, and a year or more after her succession had been opened, in the parish, is said to have been adjudicated to the state, upon the basis of the assessment so made, and of notices published more than 18 months after her death.
The act of 1877, under which the tax collector proceeded in making this adjudication, was approved April 20, 1877, and repealed only such laws as were in conflict with its provisions. It did not purport to be a curative statute, but dealt with the future, and not with the past. It had no bearing, therefore, upon the assessments and other steps required by then-existing laws to fix the liability of the tax debtor, or of the property, for taxes of preceding years, and the taxes for the years 1874, 1875, and 1876 were regulated, as to those matters, by Acts 42 of 1871 and 47 of 1873, which remained in force except so far as they were in conflict with the later statute. The matter of the assessment of property during these years was governed, exclusively, by the act of 1871, and the collection of taxes was regulated by that act and by the act of 1873, in so far, at all events, as those statutes were not repealed by reason of conflict with the act of 1877. We will, therefore, briefly recapitulate, in substance, the relevant provisions of. the acts of 1871 and 1873, and endeavor to construe them with the act of 1877, and to apply the law, as thus ascertained, to the facts in the ease now under consideration.
By the act of 1871 the tax collector was required to proceed, between February 1st and July 1st of each year, to ascertain the names of persons liable to taxation, and to prepare a list containing such names, together with a correct description of the property to be taxed, and, to that end, to serve on each tax debtor a notice, either written or printed, which was to be filled up by such tax debtor and returned .to the collector, on or before July 1st following the service thereof. If the tax debtor failed, or refused, to make such return, ihe collector was authorized to describe the property upon the basis of information otherwise obtained, subject to the right of the owner to have the assessment roll corrected, when exposed for that purpose. If the land to be assessed was known by a name, or if the name of the owner was known, the collector was required to designate it by name and by its boundaries.
The collector was required to complete this list by the first of August of each year, verify it by his affidavit, and deposit it with the parish recorder, who was required to indorse thereon the date of its receipt. The clerk of court, recorder, and sheriff were made, ex officio, assessors, and were required to assess the property described upon the list thus furnished by the collector, and for the purposes of such assessment to give notice, in the official journal, or, where there was no official journal, by posting notices on the courthouse door, informing all tax debtors that they would make assessments during the month beginning August 1st and ending Sep tember 1st.
*827 When the assessments were completed the collector was required to make three copies of the assessment roll, as prepared by the assessors, who were required to append thereto the following affidavit, to wit: “We, A., sheriff, B., recorder, and 0., clerk of the district court, in and for the parish of-, do solemnly swear that we have, fully and faithfully, assessed all persons and property in our parish, for the year -; that we have given due notice to all taxpayers that we have commenced assessing their property, and have kept the rolls open from the first day of August to the first day of September; and that we have made every possible effort to make said assessment at a fair and full cash valuation, to the best of our abilities. So help us God.”
And it was made the duty of the assessors, Immediately, to forward one of said copies to the auditor, to deposit another copy with the descriptive list obtained from the collector, in the office of the recorder, and to ■deliver the third copy to the collector, upon the order of the auditor. The collector, upon thus receiving the assessment roll, was required to proceed with the collection of such taxes as might be paid voluntarily, and to that end to give “twenty days’ public notice to each taxpayer resident in the parish” of the places at which he would be present to receive the taxes. After the expiration of the 20 days’ public notice thus provided for, the collector, except in New Orleans, was authorized to give 20 days’ written or printed notice to the owner or agent of the property to pay the tax, after which delay, if the tax was not paid, he was authorized to seize the property, by recording a description thereof, with the amount due, in the mortgage office, and to sell the same, after advertising three times within 20 days in the official journal, or, where such publication could not be made, after “public notice for such twenty days”; and he was authorized to make title to the purchaser in the name of the state; the property so sold to be redeemable within two years, otherwise — i. e., if not redeemed — the I>urcliaser to have the right to obtain a definitive title from the auditor upon presentation of the title obtained from the collector. If, at the offering by the collector, he obtained no bid sufficient to pay the taxes for which the property was offered, with penalties, etc., and adjudicated the property to the state for a less amount, it was made optional with the auditor to confirm or annul such sale, which it was made the duty of the collector to report at once. The collector was required, upon the second Monday of December of each year to return to the parish recorder a list, verified by his affidavit, of the names of the owners of the land upon which the taxes had not been paid, together with a description of such land; and the recorder was required within 10 days to record the same, and to forward a certified copy thereof to the auditor; and the filing of such copy in the office of the auditor was to vest in the state a title to the land therein described, which title was to be impeachable only on proof that the taxes had been paid before the return of the list to the recorder, reserving, however, to the owner or party interested the right to redeem the property on certain conditions. Act No. 42 of 1871, §§ 23, 26, 32, 39, 40, 42, 44, 57, 59, 60, 65-69.
The act of 1873 made no change in this law, so far as concerned the assessment of property, but dealt only with the method of enforcing payment of the taxes after the assessment, jll provided that 10, instead of 20, days’ written or printed notice should be given to the tax debtor following the 20-days public notice, and-that, after seizure by recordation, the collector should sell the property after 10 instead of 20 days’ advertisement. It further provided that upon the presentation by the adjudicatee to the district or parish court of the title made by the collector, it should be the duty of the judge to order the sheriff to put such adjudicatee in possession of the property; and it shortened the time allowed for redemption from two years to six months, and authorized the collector to bid in the property in the name of the state, where no sufficient bid was otherwise obtained, subject to confirmation by the auditor; and the act contained some further provisions, which have no bearing upon the issues here presented. Act No. 47 of 1873, §§ 1, 4, 5, 9.
The act of 1877 provided for general assessments once in four years, with annual assessments of personal property, and annual revisions, for certain purposes, of the general assessments. It required the assessor, who was to be appointed for each parish, to *829 make his assessment between the second Monday in April and the first Monday in August of every fourth year, to deliver the roll, completed, and verified by his oath, to the recorder, and to advertise the fact that he had so delivered it. And it provided that the roll should remain open for correction for 30 days, after which it was to become final. It required the assessor on or before the 10th of November to deliver one copy of said final roll to the auditor, one copy to the recorder, and one copy to the tax collector, and provided that the property assessed should be affected with a lien and privilege for the tax due by it from the date of the filing of such roll in the office of the recorder. The collector, upon the receipt of the roll, so prepared, and after giving 15 days’ notice (in the country), was required to proceed with the collection of taxes (though there may be some little doubt as to whether he was to begin at once or upon the 1st of February). On the first Monday of November he was required to file in the office of the recorder a list of persons who had not paid their taxes, with a description of the property on which such taxes were due, and the amount thereof, and such filing was to operate as a seizure of the property, and the taxes were thereafter to bear interest at the rate of 8 per cent., and no other penalty was to be exacted. On the second Monday in November the collector was required to post at the door of the courthouse a copy of the list so filed, and to publish said list twice during 10 days, with a notice to the delinquent tax debtors that on the first Monday of December, and from day to day thereafter, he would sell the property described thereon, without appraisement. And he was to make sales accordingly (the bids in ail cases to be equal to the taxes and costs), and make title in the name of the state; the delivery of real estate to be made, however, only .at the expiration of the period allowed for redemption, which was fixed at two years, and the adjudicatee being accorded the right at the expiration of that time to obtain a final title' from the auditor. If there was no bid sufficient to pay the claim for which the property was offered, the collector was required to bid in the property for the state, subject to the right of the tax debtor to redeem, as in other cases. On the first Monday in January of each year the collector was required to “render” to each the auditor and the recorder a list of the property bid in by him for the state, and of the names of the late owners, and the recorder was required to certify one of said lists to the auditor, and to file the other in his office, and such filing was to operate the forfeiture of the property described in said list and the registry of the state’s title thereto as of the date thereof. Act No. 96 of 1877; §§ 5, 12, 27-30, 33, 36, 52-54, 56-61.
It will thus be seen that the act of 1877 provided a scheme of assessment differing in many important particulars from that which had previously obtained; that it did not undertake either to vacate valid or to cure invalid assessments already made; and that it established rules for the collection of taxes which were based upon and dovetailed into the scheme of assessment so provided, but which did not purport to apply, and are, in some respects, if not entirely, inapplicable, to the collection of taxes based upon assessments made under pre-existing laws. Under the act of 1871 forfeiture resulted from the filing in the office of the auditor of a list describing the property upon which taxes remained due, and giving the names of the owners; whereas under the act of 1877 it was provided that such forfeiture should result from the filing in the office of the recorder of a list describing the lands which had been purchased by the collector in the name of the state, and giving the names of the late owners. Let us suppose, now, that prior to the act of 1877 lists for the years 1874 and 1875, showing the property upon which the taxes remained unpaid, with the names of the owners, had been filed in the recorder’s office, but had not been filed in the auditor’s office. Under the law there was no forfeiture, since the act of 1871, then in force (assuming that its provisions on that subject had not been abrogated by the act of 1873), denounced the penalty of forfeiture only when lists such as are described above were filed in the office of the auditor. That being the case, can the proposition be maintained, because the General Assembly, in 1877, enacted a law denouncing such penalty as the result of the filing in the recorder’s office of lists of a different character, to wit, showing the lands which had been purchased *831 in the name of the state, together with the names of the owners, that, therefore, the previous recording in the recorder’s office of the lists provided for by the previous legislation should'be held to operate the forfeiture of the property described in said lists? We think not. Such a construction would give a retroactive effect to the act of 1877, which its language does not warrant, and would make that act apply to conditions to which, by its terms, it is inapplicable. The case which we have supposed is the case which we are now considering; for it appears from the record that lists showing Mrs. Sarah George to have been delinquent with respect to the payment of taxes on 700 acres of land (supposed! to include the 446.18 acres in controversy), for the years 1874 and 1875, were recorded in the recorder’s office upon January 28 and December 23, 1876, respectively, but it does not appear that such lists have ever been recorded in the auditor’s office. We therefore conclude that the title by forfeiture to the state, as set up by the defendants, has not been established. This view of the matter finds additional support in the fact that the adjudication of the property in question, which is said to have been made by the tax collector in December, 1877, is not predicated upon any supposed forfeiture, but rests specifically upon the averment, as contained in the proces verbal of the tax collector, to the effect that he was proceeding under section 53 of the act of 1877, and that the property had been seized “for the payment of taxes due by Mrs. Sarah George, as owner thereof, according to the tableau and assessment rolls for the year one thousand eight hundred and seventy-six.”
It remains, then, to be ascertained whether the state acquired the title by means of this adjudication. It will be observed that the adjudication is predicated exclusively upon an assessment said to have been made in 1876 in the name of Mrs. Sarah George, but there is nothing beyond the recital contained in the x>rocés verbal of the adjudication itself to show that any such assessment was ever made. If, however, we are to assume that it was made, it must have been begun and completed after the death of Mrs. George, and hence, after she had ceased to be the owner of the property, and was beyond the reach of the notices which, as a condition precedent to its valid assessment, the law required should be given to the owner. It appears, however, affirmatively, that no delinquent list for the year 1876 has ever been recorded even in the office of the parish recorder, and hence, whether under the act of 1871 or of 1873 or of 1877, that there has been no seizure of the property for the taxes of that year, and could, therefore, have been no valid sale or adjudication; the more particularly in a case such as this, where the person in whose name the property is said to have been assessed is shown to have died before the assessment could have been made, and was as far-beyond the reach of the notices required for a valid seizure as for those required for a valid assessment.
Counsel for defendants refer in their brief, though we find no such reference in their pleadings, to forfeitures, under the act of 1877, alleged to have taken place by reason of inscriptions for the taxes of 1878 and 1879. The act of 1877, as we have seen, made it obligatory on the collector to offer for sale, and, in case of an insufficient bid from elsewhere, to bid in for the state, the property assessed under its provisions, and, having done so, to render to the parish recorder and the auditor lists of the property so bid in, With the names of the former owners; and it was the recordation in the office of the recorder of these lists that was to operate the forfeiture of the property. There is no evidence in the record, however, that the X>roperty in dispute was ever offered for sale or bid in by the state for the taxes of 1877 or 1878, or that any list describing said property as having been so bid in was ever filed in the office of the parish recorder, the lists which were filed being axxparently lists, such as had been required under the former statutes, of property from which taxes were due, with the names of the then owners, and not of the former owners, And although, upon the lists for 1877 and 1878, as thus filed, the name, “Estate of Mrs. Sarah George,” apXieared as the owner, there was no such compliance with the law as to operate the forfeiture of the property, because the conditions precedent required to accomplish that result had not been complied with: The jurisprudence applicable to the facts and the *833 law of the case, as thus found, and ascertained, is fairly indicated in the following excerpts, to wit:
“It is well established, on principle and by authorities, that a tax sale of property assessed in the name of one who is not the owner, without service of any notice of seizure on the real owner, is an absolute nullity, and passes no title.” Le Blanc v. Blodgett, 34 La. Ann. 108, citing Cooley on Tax. 259, 307; Burroughs, 210, 222; Lague v. Boagni, 32 La. Ann. 912; Guidry v. Bronssard, Id. 924; Stafford v. Twitchell, 33 La. Ann. 520; Brady v. Offutt, 19 La. Ann. 185.
“Adjudications of property to the state, based upon assessments and proceedings in the name of a dead man, are void.” Kohlman et als. v. Glaudi, 52 La. Ann. 700, 27 South. 116, citing Stafford v. Twitchell, 33 La. Ann. 520; Jackson v. Wren, 36 La. Ann. 315; Edwards et als. v. Fairex, 47 La. Ann. 170, 16 South. 736; Cucullu v. Lumber Co., 49 La. Ann. 1445, 22 South. 409.
‘We are unable to differentiate this case from those in which it has been held that assessments and other proceedings, culminating in the sale of property and conducted in the name of a dead man, have no warrant in law, and convey no title.” Millaudon et als. v. Gallagher, 104 La. 715, 29 South. 307, and cases there cited.
Having no title herself, the state could confer none, and Cole and Hutchinson therefore acquired no title at the sale made by the state in the name of Vernon, and for taxes assessed in his name, since he has never become the owner of the property. And, for the same reason, Dean acquired no title from Vernon, even supposing that, after the sale of 600 acres from the tract which contained only 446.18 acres, there was anything left for Dean to have acquired.
There can be no doubt that the ancestress of the plaintiffs was in possession .of the land in question up to the date of her death in 1876. “A possession of part of a tract of land, with title to the whole, carries with it possession of the whole.” Chamberlain et als. v. Abadie, 48 La. Ann. 589, 19 South. 574, citing Donegan’s Heirs v. Martineau, 9 Mart. (O. S.) 43; Prevost’s Heirs v. Johnson, Id. 123; Gillard v. Glenn, 1 Rob. 159; Henderson v. St. Charles Church, 7 Mart. (N. S.) 122.
The prescription of 10 years, under Civ. Code, art. 3479, “must be supported by corporeal possession in the beginning, after which it may be preserved by external use and public signs announcing the possessor’s intention to preserve the possession of the thing — as the keeping up of roads and levees, the payment of taxes, and other similar acts.” Chamberlain et als. v. Abadie et als., 48 La. Ann. 587, 19 South. 574; Millaudon et als. v. Gallagher, 104 La. 714, 29 South. 307. The defendants have shown no corporeal possession at the beginning, or at any other time, and have paid only part of the taxes; the whole amount paid by them, in nearly 20 years, aggregating' 849.13. The prescription of five years (Civ. Code, art. 3543) relates only to informalities. And the prescription of three years, under the act of 1874, does not cure defects of title such as are here disclosed: Millaudon et als. v. Gallagher, 104 La. 716, 29 South. 307, and authorities there cited.
These embrace all the grounds relied on by the defendants, and we find them insufficient, irrespective of other points presented on behalf of the plaintiffs and affecting the validity of the assessments upon which the titles set up by the defendant are based. We are of opinion, however, that the defendants are entitled to recover the amounts paid for the property by Charles J. Cole at the tax sale, and by him and them as taxes thereafter; and are also entitled to recover the amounts paid to their vendors, Hutchinson and Dean, respectively. Civ. Code, art. 2505.
It is therefore ordered, adjudged, and decreed that the judgment appealed from be annulled, avoided, and reversed, and that the plaintiffs be now declared and held to be the owners of the 241.68 acres of land forming the southern portion of the Freeman George headright, otherwise known and designated as section 49, township 4 S., range 6 E., and of the 204.50 acres, forming the northern portion of the John George, Jr., headright, otherwise known and designated as sections 50 and 3, in townships 4 and 5 S., range 6 E., all lying in the parish of St. Helena, in the proportions of one-fifth to the plaintiff Nicholas George, one-fifth to the plaintiffs William B. Marshall and Branch Marshall, one-fifth to the plaintiffs Augusta, Gertrude, Martha, Ada, and Arthur V. Hon- *835 eye, one-fifth to the plaintiff Randall Hunt Robertson, one-tenth to the plaintiffs John Randolph, Andrew I-Cerney, and Bessie Fletcher, and one-tenth to the plaintiff Charles G-. Fletcher; and that the title to said land herein set up by defendants Mrs. Ida E. Cole, individually and as tutrix of Christian G., and Mamie Ida Cole, Charles J. Cole, and Robert E. Cole, whether claimed to have been derived from the state through John G. Cole, deceased, or through W. S. Hutchinson or A. C. Dean, or otherwise, as also the titles claimed to have been vested in said Hutchinson and said Dean, be declared and held to be void and of no effect. It is further ordered, adjudged, and decreed that •there be judgment in favor of said defendants Mrs. Ida E. Cole, individually and as tutrix of Christian G., and Mamie Ida Cole, ■Charles J. Cole, and Robert E. Cole jointly, •against said plaintiffs, in the proportions in which the latter are recognized as owners of the land claimed herein, in the sum of $57.-44, with legal- interest until paid, from the dates and on the amounts as hereinafter stated, to wit: On $8.31 from May 5, 1883, and on $1.05, $2.35, $2.35, $9.10, $3.20, $2.60, $2.80, $3, $2.80, $2.80, $2.80, $2.87, $2.87, $2.94, $5.00, from December 1st of the years 1883, 1886, 1887, 1888, 1890, 1892, 1893, 1894, 1895, 1896, 1897, 1898, 1899, 1900. And it is further ordered, adjudged, and decreed that there be judgment in favor of said defendants jointly, and against the warrantor W. S. Hutchinson in the sum of $80, with legal interest thereon from February 26, 1887, until paid, and against the warrantors Mrs. Rachel Dean, John B. Dean, Miss Yiva Dean 'and Mrs. Daisy Dean, wife of John Marshall, in the proportions of one-half as against Mrs. Rachel Dean, and one-sixth each as against the others in the sum of $10, with interest thereon from July 31, 1886, until paid.
(March 2, 1903.)
It is further ordered, adjudged, and decreed that the costs in both courts be paid by the defendants and warrantors in the proportion of one-half by the defendants Cole, four-ninths by the warrantor Hutchinson, and one-eighteenth by the warrantors Dean.
BREAUX, and BLANCHARD, JJ., dissent.