Statement.
MONROE, J.
Plaintiff sues Samuel H. Bell, Charles Eckhardt, William G. Tebault, ■George G. Friedrichs, Andrew G. Friedrichs, Henry Coates, and the Metairie Cemetery Association, alleging, in substance, that he is the owner of a certain body of land known as “Oakland Park and Race Track,” having a frontage of over 2,000 feet on Metairie Road; that upon said frontage he had a Hawthorne, or Cherokee rose, hedge, which served as an inclosure for the land, as also a number of shade and ornamental trees, and that in April, 1903, the defendants, combining and conspiring to injure him, maliciously and unlawfully entered upon said land, and cut down and burned said hedge and trees, thereby injuring' him in the loss of 112 trees in the sum of $5,000, and in the loss of said hedge in a like sum. Wherefore he prays for judgment for $10,000 for damages sustained, and for $10,000 additional by way of exemplary damages.
By supplemental petition he further alleges that after the institution of this suit the defendants again trespassed on his land, and maliciously and illegally cut and trimmed 63 large trees and burned the trimmings, and that he has thereby sustained further damage in the sum of $5,000, for which he also prays judgment.
After various exceptions had been filed and disposed of, the defendants answered separately, denying the alleged trespass and damage, and further denying plaintiff’s ownership of the land referred to in the petition. The facts, as we find them from the record, are as follows:
Plaintiff and one McWilliams bought the Oakland Park property in 1866, and plaintiff a few years afterwards acquired McWilliams’ interest, and has been in possession as sole owner since that time. Upon its northern line, running approximately east and west, and measuring 2,217 feet in length, the tract is separated from the Metairie Cemetery by the Metairie Road, which, until about the time of the occurrences out of which this litigation has arisen, was a mere country road, leading from the New Canal to the parish of Jefferson. When plaintiff first acquired his land, he built a plank fence around it, supported by cedar posts, and about the same time, or shortly afterwards, planted within the fence a Cherokee rose *1081 hedge. In the course of time the fence rotted, or the planks and posts were stolen, but the hedge grew, untrimmed and untrained, until it became a mass of tangled briars, measuring from 20 to 70 feet in thickness by from 6 to 16 feet in height, and here and there climbing on trees, which had grown with it, to a greater altitude. Naturally, the horizontal growth was not altogether in one direction, the spread of the hedge over the road, on the one side and over the land of the owner on the other being in about in the same proportion, so that it might have been a serious obstruction to the road had it not been that upon the side next to the plaintiff’s property there was a ditch, which would, in any event, have rendered that part of the road unavailable for purposes of traffic. That being the situation, a few years ago a company obtained a franchise which contemplated and required the paving of the road and the building of a double-track railway thereon, and this we understand the plaintiff to have favored.
The company, however, had troubles of its own, halted in its work, and applied for extensions of time and other relief, and the plaintiff did not favor the granting of its applications, in which respect he found himself antagonized by petitions to the city council from various sources, and, among others, from the parties herein made defendants, who own, or are interested in, property lying on or adjacent to the road, and who, together with the plaintiff, attended the meetings of the council committee, and advocated their divergent views. Matters appear finally to have reached a point when it seemed not unlikely that the company would pay forfeit, and abandon its enterprise, in so far as Metairie Road was concerned, when a new actor appeared upon the stage, and a new scheme was developed.
Upon January 10, 1903, the mayor approved an ordinance which reads as follows:
“Ordinance No. 1,574, New Council Series.
“Section 1. That a board of commissioners of Metairie Road for the proper improvement and embellishment of the roadway and sidewalks of the Metairie Road from the New Basin Canal to the Jefferson parish line, be, and the same is-hereby, constituted and organized, to be composed of five members, to be appointed by the mayor, with the consent of the council, for the-term of four years.
“Sec. 2. That it shall be the duty of the said board of commissioners to care for, maintain, and embellish the roadway and sidewalks of the Metairie Road from the New Basin Canal to the Jefferson parish line, and said board is hereby vested with all the powers and rights vested, in boards of similar character by law or by ordinances of the Council.”
Acting under this ordinance, the mayor appointed as members of the board so created the persons who have been made defendants in this suit, and on February 23, 1903,. they met, and elected S. H. Bell, president, and George G. Friedrichs secretary. Mr. Bell then “suggested the advisability of taking immediate steps by addressing a letter or petition to the council setting forth the necessity of repairing the shell road on Metairie Road, and, with that view, suggesting that one track be laid, instead of two, as originally contemplated, provided, however, that said railroad company will obligate itself to put the shell road in thorough order and maintain same in good condition during-the term of its franchise”; and, the suggestion having been adopted, the board adjourned, and the letter referred to was written to the council, signed by the members of the-board, and supported by the personal attendance of some of them at the committee meetings. All this proved to be an aggravation, so far as the plaintiff was concerned; the-more particularly so since the suggestion contained in the letter resolved itself into a proposition that the company should not only be relieved of the obligations to pave-the road with asphalt or brick, put in stone-curbing, and lay a double track, but that the-single track required should be laid on the side of the road next to his land, and laid. *1083 over, or partly over, the space otherwise available as a sidewalk; the objection of the plaintiff being that the defendant Bell, as secretary and manager of the Metairie Association, whose property lies upon the other side of the road, and as one of its largest stockholders, and the other members of the board, were advocating the imposition of an unfair burden on his property for the benefit of the public in general, and for their own advantage in particular. It was whilst matters were in the situation thus described, or, say, on March 5, 1903, that Messrs. Bell and George G. Friedrichs called on plaintiff at his office, and had a conversation with him, from which they concluded that he had consented that his Cherokee rose hedge should be destroyed. Having, as they assumed, obtained such consent, they, however, took no further action until April 11, 1903, when Mr. Bell obtained from the office of the commissioner of public works an instrument in writing, reading as follows:
“To Whom it May Concern.
“Permission is hereby granted to the Metairie Boad Commissioners to remove from the roadway of Metairie Boad, from Canal street to Jefferson parish line, all obstructions, dead trees, ■etc., which said commissioners may deem advisable in order to improve and beautify said roadway. The said commissioners bind themselves not to disturb any portion of the roadway, nor to dig below grade, and to follow all lines established by the city engineer, in the progress of the work proposed to be made on said roadway.”
(The officer by whom this permit was issued, it may be remarked, was not informed that it was to be used as authority for the •cutting of the hedge on Oakland Park.)
Mr. Bell at the same time obtained two copies' of the ordinance creating the board ■of which he was president, and on the same •or the following day gave one copy to the sergeant of police in charge of the station near Oakland Park, who, at his request, posted it in the station. He then ordered Henry Coates, one of the defendants, who was in the employ of the Metairie Cemetery Association and of another organization, of which Mr. Bell was president, to engage laborers for the work which was in contemplation, and the order so given was obeyed by the posting by Coates on Saturday, April 11th, in a barroom near by, of a notice to the effect that laborers were wanted that night; the result being that 27 men were engaged, who were not informed until the last moment, and after the keeper of Oakland Park had gone to bed, of the character of the work for which they had been employed. Coates’ written instructions from Bell were as follows:
“Mr. H. Coates, Sir.
“You are hereby instructed to employ such labor as you may deem necessary to clear up the undergrowth and Cherokee hedge along the Metairie Boad from the New Basin Canal to the Jefferson Parish Line, and haul the necessary filling to bring the sidewalk up to grade, and to make the necessary repairs to the wood curbing. In this connection, you will make special note that I have permission from Mr. George L. Bright to cut, or trim, his hedge, in the performance of this work, as provided under ordinance No. 1574 N. C. S. Yours respectfully,
“[Signed] S. H. Bell, President.”
Acting under these instructions, Coates entered upon his work as has already been remarked, on Saturday night, after the keeper employed by plaintiff’s lessee had gone to bed, with laborers working under extra pay. When, on the following (Sunday) morning, the keeper found the hedge, nearly all cut down, and the laborers still at work inside of plaintiff’s lines, he remonstrated with Coates, who told him that he was acting under the authority of the mayor and commissioner of public works, and when the keeper, who had in the meanwhile reported the matter to the plaintiff, and had received instructions to that effect, requested the sergeant of police to stop the work, he was told that it was being done under the authority of the ordinance posted in the station. An hour or two later the plaintiff himself appeared on the scene, and told Coates that he had no right to be where he was, or to be doing what he was *1085 ■doing, and ordered him off the premises; but Coates civilly regretted that he could not ■obey the order, for the reason, as' he said, that he was acting under the orders of Mr. Bell, which were to him of paramount authority. And he and his laborers continued to work on plaintiff’s land, in spite of the latter’s repeated remonstrances, all day Sunday and Sunday night and on Monday and every other day during the week, until there was nothing left above ground of the hedge ■or of 112 trees that had grown up with it, save, perhaps, the ashes, and until they had built a wire fence on the front of the property, and had set out plants or cuttings for a hedge of another variety than the Cherokee rose; after which they returned and trimmed. 63 large trees, which up to that time had been undisturbed in accordance with the views of some one other than plaintiff, who was not consulted. On the 22d of April the board of commissioners held their second meeting, and (quoting from, the minutes)—
“The president stated that the improvements on Metairie Road, under Ordinance 1,754 N. C. S., had been inaugurated under his personal supervision, and that he had put a large gang of men at work, clearing up the underbrush and wild rose hedge, and that he would follow up the work by filling the sidewalks on the river side of Metairie Road and make the necessary repairs to the roadway. Mr. George G. Friedrichs stated that he had called, with Mr. Bell, upon Mr. George L. Bright, at his office, and that during the visit Mr. Bright had given his consent to have Bell trim or cut his wild rose hedge, dividing his property from the Metairie Road. In this connection Mr. Bell stated that he had found it necessary to run a line of new fence, some 280 posts and six strands of No. 10 galvanized iron wire, along Mr. Bright’s property. On motion, duly seconded, the report of the president was received and his action in the matter duly approved.”
It may be added, iu this connection, that the program outlined by the president of the board was carried out; that the sidewalk, as it was called, ditch, as it was, on the river side (plaintiff’s side) of the road, was filled, and that the roadway was repaired; and it may also be added that the railway company subsequently laid its single track on the sidewalk as thus filled.
The theory, as propounded by the defendants, that the hedge in question no longer served the purpose of a barrier, or any other useful purpose, is not sustained by the facts, since the evidence shows that up to the moment of its destruction the park was used at times as a paddock or pasture for horses and stock, and that, though there were gapk here and there, which, presumably, were closed in some way, the main body of the hedge was well-nigh impenetrable; and it also shows that the hedge served a useful purpose as a screen in preventing horses in training from being scared by electric cars and other ve-' hides on the road, in preventing the public from enjoying, without paying the price of admission, the races which were occasionally held in the park, and in securing privacy for those who hired the park for picnics. The plaintiff, moreover, seems to have derived some satisfaction from the idea that it shut out the view of the cemetery across the road, beautiful though that silent city may be.
Upon tbe other hand, the hedge was old, and contained a great deal of dead wood. In the opinion of many people, no doubt, it was an unsightly anachronism. It is said to have furnished a lurking place for evil people, who committed evil deeds, so that those who had occasion to do so disliked, or were afraid, to pass it, particularly at night. It is admitted that after it was cut down the plaintiff renewed, for five years from April, 1905, the lease of the park, to the same lessees," at the same rental, viz., about 86,000 a year. It is also admitted that before the expiration of the lease, as thus renewed, the Cherokee rose hedge will have grown, from the roots, to such dimensions as to answer the purpose which it is said to have sub-served when cut down. It is shown that the other hedge, which the defendants have planted, will by that time be equally, if not *1087 more, effective, and that the wire fence is there in the meanwhile. The 112 trees which were destroyed are said to have heen willow and haekberry, from two to ten inches in diameter, but it is not shown how many were of the one size and how many were of the other, or how much any one of them was worth; nor is it shown or suggested that the 63 trees that were trimmed were in any wise injured or disfigured thereby. It is shown that the Metairie Road is very much improved in appearance and for practical purposes by the work that has been done on it, including the cutting of the hedge; and the inference is a fair one that the improvement will, to some extent, inure to the benefit of the plaintiff’s property.
The plaintiff positively and emphatically denies that he consented to the cutting down, or even to the trimming, of his hedge, and the conflict of testimony on this subject has received careful consideration, the conclusion being that he did not so consent, and that, whilst the two defendants who called on him may have had some reason for believing, as the result of their conversation, that he would not or did not object to the trimming of the hedge in so far as it encroached upon the public road, there was nothing to authorize their assumption that he was willing that they should go upon his property and cut down or destroy anything. In fact, he was in no position to give such consent, since the property was in the actual possession of the lessees; and it is admitted that he so stated, and is proved that Bush, the manager for the lessees, and Walsh; the keeper, protested against the ' trespass on Sunday morning, as soon as they discovered that Coates and his gang were at work. As to the cutting of the 112 trees and the trimming of the 63 trees, there is no pretense that anything was ever said to plaintiff on that subject. It is considered unnecessary to enter into a critical analysis of the testimony and facts leading to the conclusion thus stated, which is supported by the findings of the two juries by whom the case was tried in the district court.
The Metairie Cemetery Association is not shown to have been in any way connected with the acts complained of, nor does it appear that the commissioners of the Metairie Road, other than S. H. Bell and George G. Friedrichs, were so connected with those acts as to render them liable to the plaintiff in damages, since they knew nothing of them until after they had been committed, and approved of nothing save that which" they were informed had been done with the plaintiff’s consent. George G. Friedrichs, on the other hand, though not specifically fold that the work was to be begun on the night of April 11th, admits that he knew that the hedge was to be cut down, from which, considering the relations between them, no other reasonable inference can be drawn than that the trespass was an agreed thing between him and Bell, and that the latter, in personally taking charge of the matter, acted for both. Friedrichs, moreover, approved of what had been done, at the subsequent meeting of the board of commissioners, with full knowledge of all the facts.
Opinion.
In so far as the plaintiff’s hedge encroached upon the public road, and had become either a public or a private nuisance, it might, no doubt, have been removed and abated by competent authority and legal methods. Whether the board of commissioners of the Metairie Road, or the defendants Bell and Friedrichs, as president and member of that board, respectively, were vested with such authority, and whether the course pursued by them with reference to the obstruction to the road was legal, need not be considered, since those questions are overshadowed by that arising from the trespass upon plaintiff’s land and the destruction of his property thereon, in violation of his remonstran *1089 ces, and the invasion thereby of his rights as a citizen. The only legitimate end of government, says the Constitution of this state, “is to protect the citizen in the enjoyment of life, liberty, and property.” When the property of a citizen is invaded and destroyed illegally and in despite of his protests, and he is thus deprived of both property and the liberty to enjoy it, he is also deprived of that which makes life valuable; and his appeal for protection and redress is founded upon fundamental principles, ad- ■ herence to which is not only obligatory upon the courts of this state as a matter of written law, but is essential to the preservation of organized and civilized society wherever it may' exist. Whether the plaintiff’s hedge on the plaintiff’s land was in a condition to keep in or to keep out stock; whether it served any useful purpose as a screen behind which horses might be trained or picnics held, or to shut away from sight the tombs of the dead on the adjacent property; whether it was an ornament to the neighborhood or a blur upon the landscape; and whether the plaintiff’s trees were trimmed or untrimmed —were matters with which the defendants had no more right to meddle than with the color of plaintiff’s house or the arrangement of the chairs at his. dining table. Nor is there any greater force in the suggestion that the hedge on plaintiff’s land had become a lurking place for bad characters. The same thing might be said of a valuable forest, and we know that the same thing is said of houses and neighborhoods in densely populated cities; but neither the forest, the houses, nor the neighborhoods are to be destroyed on that account or pretext, and still less upon the mere ipse dixit of individuals having personal interests at stake.
The proposition that an owner of real property under a lease for years has no cause of action for mere trespass upon the property leased is unsound, and is not sustained. by the authorities cited in its support.
It is true that the lessor is not bound to guaranty the lessee against disturbance caused by persons not claiming any right to the premises, but he is bound to protect the lessee in the quiet enjoyment of the property leased as against persons who set up such claims; and in either case the possession of the lessee being the possession of the lessor, the disturbance of the one is necessarily the disturbance of the other. Civ. Code, arts. 2703, 2704; Tippet v. Jett, 10 La. 362; Dennistoun et al. v. Walton, 8 Rob. 211.
Upon the first trial of the case in the district court the jury brought in a verdict for the plaintiff and against the defendants Bell, Coates, Eckhardt, and G. G. Friedrichs in the sum of $1,000, and the judge a quo granted a new trial. On the second trial there was a verdict against the same defendants in the sum of $1, which was made the judgment of the court. The plaintiff having appealed, the defendants named have answered, praying that they be discharged entirely. The evidence, as appears from the statement which precedes this opinion, is insufficient to hold Eckhardt, and does not justify the conclusion that the other named defendants were actuated by any particular malice towards plaintiff. The trespass committed by them was, however, an outrage, with but few mitigating circumstances, and the plaintiff is entitled to recover not only for the actual damage thereby inflicted on him, but is entitled to recover, and the defendants should be condemned to pay, something by way of exemplary damages. The intrinsic value of the property destroyed is not shown, and could not well be shown, with any degree of certainty. The somewhat difficult duty of fixing the compensation to which the plaintiff is entitled for the invasion of his rights and the injury to his feelings, and of determining what amount should be awarded by way of exemplary damages, is left to the court, and in the discharge of that duty we fix the total amount at $1,000.
*1091 It is therefore ordered, adjudged, and decreed that the judgment appealed from he reversed in so far as it condemns the defendant Charles Eckhardt, and as to said defendant that plaintiff’s demand be rejected, and his suit dismissed, at his cost. It is further ordered, adjudged, and decreed that as to the defendants Samuel H. Bell, Henry Coates, and George G. Friedrichs the judgment appealed from he amended by increasing the amount thereof to $1,000, and, as amended, that said judgment be affirmed; the defendants last named to pay the costs of the appeal.