The agents and employees of the Town of Winnfield, Louisiana, ostensibly to provide clearance for a line of new electric wires, cut from a large, graceful pin oak tree growing in the southwest corner of plaintiff's property in said town, twenty-seven limbs, beginning with those nearest the ground. The tree, from this damage, was converted from a thing of beauty into an ugly, unsightly object. At the time the trespass occurred, plaintiff and members of his family were absent from home. He was notified that the cutting was being done, and hurried from his office to the scene, arriving before all the limbs had been cut. He then and there protested vigorously to the workmen and to the superintendent of the light plant, who arrived while plaintiff was there, about the cutting of the limbs, and informed them that it was wholly unnecessary and unauthorized by him. The superintendent informed plaintiff that it was necessary to cut the limbs in order to provide clearance for new and higher lines of electric wires.
This suit was filed within a few days after the incident above related. Plaintiff *Page 139 
sued to recover damages done to the tree, and for damages to the property as a whole because of the setting that is created by the presence of this unsightly, disfigured tree among the many others that are symmetrical and ornamental. He alleges that the trespass was wanton and malicious and "has caused him disappointment, mortification, and mental suffering all on account of the brutal actions of defendant, its officers and employees."
Defendant in limine excepted to the citation and was sustained. Another service was made and to the citation thereunder defendant also excepted, but was overruled. This ruling is complained of here.
Answering, defendant takes the position that it acted within its right as a municipal corporation in having the limbs cut as was done, because some of them, it is alleged, constituted a danger and hazard as they were so low as to interfere with safe travel on the sidewalk; and that removal of the other limbs was necessary to provide safeway for new and higher lines of electric wires the town was then installing. In addition, defendant, in effect, avers that plaintiff's consent was given to defendant to cut the limbs in that when informed by defendant's superintendent that the limbs would be cut, he registered no objection to such being done.
From a judgment for plaintiff of Two Hundred Fifty ($250) Dollars, defendant appealed. Answering, plaintiff asked for increase in the award to One Thousand ($1,000) Dollars, the amount for which he sued. Appellant assails the judgment as being excessive.
The facts of the case, in the main, are not controversial.
[1] The exception to the citation was properly overruled. Prior to filing of this suit the mayor of Winnfield was inducted into the armed forces of the Government. For this reason he was granted leave of absence by the Council and one of its number was elected mayor pro tempore. The second service was made on the mayor pro tempore on a date the elected mayor happened to be in Winnfield on short time furlough. The position of the exceptor is that service should have been made on the mayor as he was then in the town. Prior to said service the mayor declined to submit to service, when asked to do so, on the ground that notwithstanding his presence there, he was not acting as mayor and would not resume his duties as such until discharged from service. In our opinion this position is well founded. So long as the mayor was a member of the armed forces he was incompetent to perform the duties of his office. The fact that he was temporarily in Winnfield when the service was made did not alter the situation.
Defendant operates as a town under Act No. 136 of 1898, as amended. Subsection 18 of Section 15 of this act takes care of a situation such as exists in the present case. Among the powers delegated to a town operating under said Act is to elect one of the aldermen (councilmen) to be mayor pro tempore who shall perform the duties of mayor in the absence or disability of that officer; and the mayor pro tempore when acting for the mayor shall have the same power and perform the same duties as mayor.
[2] Plaintiff's lot fronts 182 feet on Maple Street and extends northerly between parallel lines 336 feet. It contains 1.4 acres. On three sides there are streets. He acquired the lot in 1904 and erected a large home thereon in 1906. The residence sits back a considerable distance from Maple Street. From the time it was built plaintiff and his wife, both being lovers of trees, devoted much time and made considerable expenditures in furtherance of their ambition to beautify and enhance the attractiveness of the property by planting, growing and nurturing trees on the lot. Trees from the States of Texas, Tennessee, North Carolina, Mississippi and Louisiana are now and have been for many years growing thereon.
The mutilated tree was planted some thirty-five years ago. It was then four or five years old. Its location on the lot gave it advantages of moisture supply not enjoyed by other trees and, for this reason, it grew faster and became the largest and most stately of them all. It measures 8 feet in circumference 2 1/2 feet above the *Page 140 
ground and is more than 10 feet north of the property line and 20 feet north of the curb. Its limbs extended out in all directions, the lower ones slightly downward and the uppers ones slightly upward. The stumps were of different lengths. The tree was the special pride of plaintiff and his wife to the time of her death, a few years ago. Visitors and others who observed it were very much impressed with its symmetry and beauty. Now, all of this has ceased to exist, and it is well established that nature will not restore limbs of the character and position of those that were removed. Other limbs may grow from the stumps of the amputated ones, but they will be bushy and will extend upward instead of nearly horizontal. Even to attain this result will require many years.
For more than twenty years prior to this suit the Town of Winnfield was supplied with electric current by Gulf Public Service Company under franchise from the town. Some four or five months prior to the time this controversy arose, the town acquired from this company its electric light plant and equipment and, in its proprietary capacity, began to supply its citizens with electricity. For the time the company provided current, its wires along the north side of Maple Street passed through the limbs and foliage of the tree in question without any of the limbs being burnt or the infliction of injury in other respects to the tree, or to the wires. This satisfactory situation was attained simply by cutting a lane of sufficient size to admit passage of the wires through the limbs. For the time this condition existed not one short circuit or other irregularity in transmitting current occurred.
Soon after the town took over the electric light plant, etc., it began to improve the system, which involved installation of new wires at an elevation in some places greater than that of the old ones. To effectuate the innovation along Maple Street the present controversy may be accredited. But under no stretch of the imagination can it be seen why, to accomplish this change in front of plaintiff's property, the tree should have been stripped of so many of its limbs, on one side for 20 feet from the ground, and on the other side (next to the wires) for a distance of 31 feet. On the north side of the tree limbs were cut that in no manner and to no extent touched the area through which the wires were intended to pass. These were wholly over plaintiff's land. This part of the trespass is sought to be excused on the flimsy pretext to bring about uniformity in the tree's appearance.
The lowest of the limbs cut from the north side of the tree was ten inches in diameter at the tree and extended almost horizontally over the sidewalk and neutral ground next to the curb. The testimony is not conclusive of the question, but it is possible there was a clearance of not over six feet between it and the sidewalk and neutral ground. Two witnesses testified that their foreheads came in contact with the limb on one occasion. Aside from these two complaints, this limb, over so many years, seems not to have interfered with anyone. It was the nearest approach to a nuisance of the many limbs removed. No effort was made to have it so declared.
Mr. Donohoe, defendant's superintendent, gave the following testimony in response to questions by the court, to justify the cutting of the limbs on the north side of the tree, to-wit:
"Q. Now, was it necessary to take the limbs off the tree in order to make that raise or not; or could you have cut a lane through the tree and left the limbs there? A. Well, in cutting the lane through the tree, Judge, we could have, but we would have had to had a scaffold up their in order to get out and cut a lane through the trees, because some of the limbs were very small and we couldn't get a man out on the edge to cut them.
"Q. That is the reason that you cut the limbs from around the tree? A. Yes, sir."
This excuse does not excuse. This testimony makes it quite clear that the limbs were cut and removed to make way for the line of wires instead of cutting a lane through the boughs, because the latter course would have been more inconvenient.
[3] The trial judge in written reasons for judgment, at length considered and discussed the testimony bearing upon the defense that plaintiff impliedly assented to the *Page 141 
cutting of limbs from his tree. He specifically rejected the defense. The testimony offered by defendant in support of this defense consists exclusively of that of Mr. Donohoe. He says that Judge Oglesby, while walking westerly toward the business section of Winnfield, a few days prior to the day the limbs were cut, passed him and a crew of workmen, when some trees were being trimmed on East Main Street, and that the judge asked him if they were going to trim the limbs on out east toward his place; and was answered in the affirmative; that he then inquired about the oak in the corner of his yard, to which Donohoe says he replied: "Judge, we are going to have to take some of the limbs off"; that he stood there a minute or two, then turned around and walked away without saying more. Judge Oglesby positively and emphatically denies that any such conversation transpired. He testified that he never walks from his home to his office, but invariably makes the trip in automobile in the morning about two hours earlier than the time Donohoe says the conversation occurred.
Judge Oglesby's prompt action immediately after being advised by 'phone that the tree was being mutilated is wholly inconsistent with the idea that he ever to any extent or in any manner, impliedly or otherwise, assented to his tree being disfigured, as was done. Donohoe says plaintiff was very mad when he arrived on the scene (which plaintiff admits), and asked: "Who in the hell authorized the cutting of the limbs?" It is significant that Donohoe did not then and there say that the cutting was being done with plaintiff's assent, but, on the contrary, simply stated that it was necessary to provide passage for the new line of wires. It is also' significant that when asked by the judge why he was not consulted before the limbs were cut, Donohoe replied: "You were not at home; I did not know where you were." This was said notwithstanding the fact that plaintiff has resided in Winnfield nearly one-half a century and is a prominent citizen and attorney there.
It would certainly convict plaintiff, a lover of trees, of being a very queer and unusual person to hold that he would have assented to the disfiguring of a tree upon which he had bestowed so much care and attention. It is unthinkable that any rational person like situated would have done so.
The most charitable view we are able to take of Donohoe's testimony is to hold that he is woefully mistaken and/or confused.
However, granting, arguendo, that the conversation did occur, as testified by Donohoe, in the ultimate it cannot have the weight and effect defendant seeks to have accorded it. The fact that plaintiff did not then and there protest against the intimation that limbs on this tree would be cut, does not necessarily imply that he assented that such be done. This identical question was tendered in Bright v. Bell et al.,113 La. 1078, 37 So. 976, and was resolved against the contention of the defendants.
As a matter of fact, it appears clearly that in no instance was the owner's consent to permit trimming of trees or cutting of limbs therefrom sought by the town's officers and employees. Generally the housewife would be told of the purpose to do such work, after the employees arrived at the home. It seems that the town's officers erroneously assumed that the town had the legal right to do to trees all they desired in the furtherance of installing and maintaining electric lines whether the owners were willing or not.
[4-6] The law as laid down by textbook writers and as announced by the courts of this state limiting the extent and defining the manner by which municipalities may remove and/or trim privately owned trees, in the promotion of some work of public utility, is quite clear. The leading case of Tissot et al. v. Great Southern Telegraph Telephone Company, 39 La. Ann. 996, 3 So. 261, 262, 4 Am.St.Rep. 248, deals with and elaborately discusses such right. Many cases involving damage claims for illegally cutting down or mutilating trees by municipalities, individuals and private corporations have since arisen. None of these to any extent abrogate or modify the rules laid down and principles applied in the mentioned case, but, on the contrary, affirm them.
On the property of plaintiffs in the Tissot case, there were four full grown magnolia *Page 142 
trees, twenty years old, two on each side of the gate entrance, between twelve feet and fifteen feet apart, which, as said by the court, "presented an imposing appearance." The defendant, in the execution of a contract with the City of New Orleans, was constructing a fire alarm telegraph through its streets, over a designated route. When the damage to the trees occurred plaintiffs were absent from home. Defendant's agents went thereon and committed a serious trespass, described by the court as follows:
"During the summer of 1886, employees of the defendant company entered the premises, and climbing the trees to some 25 feet from the ground, actually did cut off from two of them a number of limbs projecting on the street, so as to leave an open space in the foliage, varying from 25 to 40 feet in circumference."
To the suit to recover damages for the trespass, defendant tendered the same defenses as are advanced in the present case. It was expressly pleaded that the removed limbs constituted a nuisance in that they were on the designated route and were an impediment to the execution of the contract; and, finally, it was pleaded that no more limbs were removed than was necessary. Plaintiffs were given judgment by the District Court for $750, which was reduced to $400. Disposing of the nuisance question, the court, inter alia, said:
"It is true that under its charter, already cited, the city is expressly vested with the power 'to suppress all nuisances'; but this must be construed so as to apply to cases of nuisances clearly so, to the detriment of public health and public convenience; for otherwise the removal or abatement would be unlawful.
* * * * * *
"The fact that a particular use of property is declared a nuisance by an ordinance of the city does not make that use a nuisance, unless it is in fact so and comes within the idea of a nuisance. Hence authority conferred by an ordinance of the city is no protection against liability, unless its unlawful character is clearly established. Therefore (except in cases of great public emergency, when the emergency may be safely regarded as so strong as to justify extraordinary measures upon the ground of paramount necessity, or when the use of property complained of is so clearly a nuisance as to leave no room for doubt on subject,) it is the better course to secure an adjudication from the courts before proceeding to abate it.
* * * * * *
"In the present instance there is nothing to show that the overhanging of limbs of trees, on the sidewalks from within the property, has ever been declared by law or ordinance, or even considered as a nuisance."
What the court said in the Tissot case touching the nuisance defense clearly applies to the instant case, and repels the argument that the town had the right to remove any of the limbs on the ground that they constituted a nuisance.
[7] Unless a nuisance does in fact exist, no one, not even the municipality in which it is located, is protected against suit for damages for voluntarily removing that which is deemed to be the nuisance. The safe rule is to have the alleged nuisance judicially declared to be a nuisance and its abatement procured through processes of government orderly exercised. It is only in cases of emergency that abatement of a nuisance may be accomplished without prior adjudication of a court authorizing such to be done, and even in such cases, the abatement is done at the actor's risk and peril.
[8] The following excerpts from the Tissot case are peculiarly applicable in principle to the present case:
"The argument is fallacious, and a begging of the question that, in this case, although the limbs were not strictly a nuisance, they were obstacles in the way of a public necessary improvement, which had to be instantly removed; for it is not shown that it was actually impossible to put up the posts and run the wires at any other place or otherwise than through the space occupied by the branches and the foliage.
* * * * * *
"It is likewise manifest that, even if the posts could not have been erected elsewhere, *Page 143 
there existed no reason whatever to cut off the limbs of the trees so as to leave in the foliage an open space ranging from 25 to 40 feet in circumference, or 8 to 13 feet in diameter, for the mere purpose of running through that space an almost imperceptible wire.
* * * * * *
"From the premises, it clearly follows that, as the overhanging of the limbs cut by the employes of the defendant company was not a nuisance, and surely not such as required or authorized an immediate removal by the city, the company, or any other person, the entry on the premises and the cutting were wanton acts which constitute a trespass, and an infliction of injury to property and feelings which demands the allowance of compensation to the injured party.
* * * * * *
"It is evident that the plaintiffs have sustained injury in the wanton invasion of their premises, in the unjustified destruction of their property, in the deprivation of material, physical and moral enjoyment, in the endurance of aggrieved feelings and in the apprehension of a possibly irremediable wrong, for all of which they are entitled to compensatory damages.
"The law on the subject of assessment of damages in cases of offenses and quasi offenses leaves much discretion to the judge or jury. R.C.C.1928."
[9] Referring to the quantum of damages to which the aggrieved owners had suffered, the shown values of the trees, time for new growth of limbs, etc., the court appropriately said:
"It does not put a value on the disappointment, mortification and other sufferings of the plaintiffs, as such things cannot be said to be measurable and appreciable in dollars, though, where there has been a mental endurance, some adequate pecuniary compensation must be made.
"The Code provides that, in cases of unlawful deprivation of some legitimate gratification, although the same are not appreciated in money, yet damages are due. R. C.C.1934; 4 Ann. 440; 10 Ann. 33."
The Tissot case is approvingly cited in Fuselier v. Great Southern Telephone Telegraph Company, 50 La. Ann. 799-806, 24 So. 274, wherein an award of damages of $250.00 was given for trespass upon the property and cutting therefrom many small trees that, however, would have had to be removed had defendant expropriated the right of way along which they grew, a right, it was conceded, it had.
In the case of the City of New Orleans v. Shreveport Oil Company, Inc., 170 La. 432, 128 So. 35, a water oak owned by the city was cut down and removed by defendant after its request to do so had been refused. Defendant was condemned to pay the city $750 for the wanton destruction of the tree. The Tissot case again was referred to approvingly.
[10] Authorities, at great length, in addition to those above mentioned, could be cited to support the proposition that trees belong to the owner of the soil whereon they stand regardless of their proximity to property lines and no one has the absolute right and may not with impunity, under any guise, go upon the land, climb the trees and remove limbs therefrom without incurring the penalty the law makes certain for such unauthorized acts. If he has valid complaint on account of the tree's location, the spreading of its boughs, etc., he may appeal to the courts for relief and in cases warranting such action, he will be afforded such relief as the facts of the case and circumstances justify. He should never, except in instances of emergency, take the law into his own hands.
In the Tissot and Shreveport Oil Company cases, supra, the action of the defendant was characterized as being wanton and wholly inexcusable; and so we find in the present case. In the Tissot case it was also found that: "The damage done is daily being repaired, and that, in the course of time, it will hardly be perceptible, so that the original condition of things will be fully restored." This happy attainment is not probable in the present case; surely not during the lifetime of the plaintiff.
[11, 12] As said in the Tissot case, actual damages in a case of this character are not susceptible of proof, but that damages have been sustained by the aggrieved owner in different ways is not open to debate. *Page 144 
Disappointment, mortification and other sufferings, not measurable and appreciable in dollars, should be given consideration in determining the award to which he is entitled. The lower court was too conservative in fixing the amount of damages due plaintiff; this amount should and will be doubled.
[13] It is urged on behalf of defendant that the proof does not show that the Town Council authorized the limbs to be cut. The suit was not defended on this ground. The answer does make such a special plea. The argument is in contradiction of the defense that the town had the right to cut the limbs, and also that plaintiff assented to the cutting before it was done. Anyway, it is not necessary to become liable for the tort of an agent that the tort be expressly authorized by the principal. This is rarely done. If the tort is committed within the scope of the agent's employment and in furtherance of his master's interest, liability therefor ensues.
[14] Lastly, appellant complains that the judgment condemned it to pay all costs of suit, and calls attention to Act No. 135 of 1936, which limits liability of the state, of a parish, a municipal corporation, and other political sub-divisions of the state to the payment of costs of taking testimony in cases wherein judgments adverse to them are rendered. The point is well taken. Appellant is responsible only for stenographer's fee in taking down and transcribing the testimony in the case.
For the reasons herein assigned, the judgment appealed from is amended by increasing the principal amount thereof to Five Hundred ($500) Dollars, and by condemning defendant to pay only the stenographer's fee for taking and transcribing the testimony in the case. As thus amended, the judgment is affirmed. *Page 184