ROGERS, Justice.
 

 On March 5, 1906, James Sperling purchased a tract of land containing 5% acres, more or less, situated in the Parish of St. Mary on the east side of the Atchafalaya River on what was formerly known as Tiger Island. Sperling died on April 21, 1913, and his wife, Arthemise Hebert Sperling, died on May 21, 1931. On November 26, 1932, the tract of land described as containing
 
 7
 
 acres situated in Morgan City, St. Mary Parish, Louisiana, assessed to James Sperling, was sold at tax sale for the taxes of 1931 to Dr. Charles C. DeGravelle. On January 6, 1933, Dr. DeGravelle, the tax purchaser, by notarial act sold all his right, title and interest in the property to Raymond Egle.
 

 By virtue of certain resolutions adopted at meetings held on October 19, 1937, and August 9, 1938, the Board of Commissioners of the Atchafalaya Levee District appropriated a right of way for the construction by the United States Government of a levee along the water front of Morgan City. Included in the property appropriated
 
 *497
 
 was 1.40 acres of land which formed a part ■of the larger tract containing 5% acres acquired by James Sperling in 1906, by Dr. Charles C. DeGravelle in 1932, and by Raymond Egle in 1933.
 

 On August 18, 1938, the Atchafalaya Levee Board, by notarial act, entered into a contract with Raymond Egle whereby Egle agreed to accept $1100 in full settlement and compensation for all his claims against the Levee Board growing out of its appropriation of the 1.40 acre tract of land for levee purposes. All the deeds evidencing the foregoing transactions were timely placed of record in the clerk’s office of the Parish of St. Mary.
 

 On March 14, 1939, the Atchafalaya Levee Board filed a concursus proceeding impleading the heirs of James Sperling and his wife and Raymond Egle. The Levee Board deposited in the Registry of the Court the sum of $1100 which the Levee Board had agreed to pay and Egle had .agreed to accept as compensation for the appropriation for levee purposes of the 1.40-acre tract of land. Alleging it had been advised that the heirs of James Sperling and wife were claiming to own the property, the Levee Board asked the Court to determine to whom the amount of $1100 should be paid.
 

 The heirs of Sperling and his wife answered the suit claiming they were the owners, of the tract of land which was sold for taxes in 1932. They attacked the tax sale on two grounds — first, that the land was not properly assessed in the name of the co-owners, and, second, that no notice of delinquency was given or served as required by law. Egle, who acquired the property from DeGravelle, the tax purchaser, filed an exception of no right or cause of action which was overruled. Egle then filed a plea of acquiescence and estoppel against the claim set up by the Sperling heirs. He also filed a plea of prescription of one and three years against the claim of the heirs and their demand to set aside the tax sale. Egle then filed an answer and reconventional demand, claiming the ownership of the property, asserting the validity of the tax sale and reurging practically all the contentions contained in his various pleas.
 

 After the trial on the merits, judgment was rendered in favor of Egle and against the Sperling heirs decreeing Egle to be entitled to the $1100 deposited in Court by the Levee Board. The Sperling heirs appealed to the Court of Appeal for the First Circuit. Egle answered the appeal and asked that his pleas of acquiescence, estoppel and prescription be maintained. The Court of Appeal, by a divided court, maintained the plea of prescription and affirmed the judgment. 8 So.2d 380. On the application of the Sperling heirs, a rehearing was granted and after further considering the case, the Court of Appeal, by a divided court, reinstated its original decree. 12 So.2d 41. The Sperling heirs then applied to this Court for a writ of review which was granted.
 

 It is not and can not be disputed that the tax sale to Dr. DeGravelle under which Egle holds is invalid, since at the time the sale was made James Sperling, in whose name the property was assessed, was dead.
 
 *499
 
 Obviously, no notice of delinquency could be served upon him. Nor is there any evidence in the record to show that the widow of James Sperling, prior to her death, or any of the six heirs was served with such a notice. Federico v. Nunez, 173 La. 957, 139 So. 18. Therefore, the tax sale to Dr. DeGravelle should be set aside unless the pleas of estoppel and acquiescence, or the plea of prescription filed by Egle are well founded. The Court of Appeal did not find it necessary to pass upon the plea of estoppel and acquiescence since it reached the conclusion on both hearings of the appeal taken by the Sperling heirs that the plea of prescription should be maintained.
 

 The tax sale was made on November 26, 1932, shortly after the adoption of the amendment to section 11 of Article X of the Constitution in November, 1932, extending the prescriptive period for attacking a tax sale from three to five years from the recordation of the tax deed. The constitutional provision, as now amended, has the effect of setting at rest all questions affecting the tax sale, except that of prior payment of taxes for which the property was sold.
 

 As more than five years elapsed between the recordation of the tax deed and the filing of the answer and reconventional demand of the Sperling heirs attacking the tax sale in this suit, it follows that the judgment of the Court of Appeal is correct, unless, as contended by the Sperling heirs, the running of the prescription has been suspended by reason of the occupancy under a claim of ownership of the property by either one or more of the tax debtors. This is the crucial question which must be determined in the case.
 

 As pointed out by the Court of Appeal in its opinion on the rehearing of this, case, reported in 12 So.2d at page 42: “The kind and nature of possession required to operate as a suspension of the prescription involved, is that of a corporeal' detention of the property. Levenberg v. Shanks, 165 La. 419, 115 So. 641, 642. In that case it is also stated that ‘no other possession than actual corporeal possession is sufficient to operate as a continuing protest agains the tax title, and thereby prevent the peremption from accruing.’ And' in Tensas Delta Land Co. v. Anders, 158 La. 94, 103 So. 522, 523, it seems to be made the burden of the one claiming such possession to support it by sufficient and competent proof, for it is therein stated: ‘In this case defendants (who held the position of the plaintiffs in the present case) must prove that the tax debtor or his heirs-were in possession of the property when-the Constitution of 1898 was adopted, and that they have since remained in continuous possession thereof, to avoid the effect of the three years prescription (now five years) pleaded by plaintiff.’ ”
 

 Therefore, in order to interrupt the running of the prescription of five years pleaded by Egle, the burden is on the Sperling heirs to show actual corporeal possession by which they exercised some claim of exclusive dominion over the property, a claim operating as a continuing protest against the tax title held by Egle. In both opinions the Court of Appeal reached the conclusion that the Sperling heirs had
 
 *501
 
 failed to adduce the proof required to show the kind of possession which the law requires to suspend the running of the prescription on which Egle relies.
 

 At the time Egle acquired the title, none of the Sperling heirs was in possession of the property except Wesley Sperling who lived in the house which was located on the property at the time of the tax sale. It is conceded that if Wesley Sperling retained adverse possession of the house and the tract of land, his possession would inure to the benefit of the coheirs. Obviously, if Egle who acquired the property from the ta'x purchaser took possession of the property as owner as against the Sperling heirs; there was a clear.lack of such possession on the part of the heirs as would amount to a continuous protest against the tax sale from which Egle derived his title. On this phase of the case and in order to emphasize the lack of the necessary possession on the part of the Sperling heirs, the Court of Appeal on the first hearing, reported in 8 So.2d at page 382, found the following facts:
 

 “The Sperling heirs did not file a proceeding to set aside the tax sale until they filed their answer and reconventional demand in this suit on March 23, 1939. It is true that some of them made some verbal claims of ownership to the property a year or two previous to this time but such indefinite and extra-judicial oral claims could not meet the constitutional requirements that a ‘proceeding to annul’ the tax sale must be instituted within the five years. As more than five years elapsed between the recordation of the tax deed and the institution of a proceeding by the Sperling heirs to set aside the sale, it follows that if the tax purchaser or his transferee, Egle, had possession of the property as long as five years previous to March 23, 1939 the right of the Sperling heirs to attack the tax sale for the alleged defects has been barred under the constitutional peremption.
 

 “As already stated, Egle acquired a title from the original tax purchaser on January 6, 1933, and the evidence shows that he erected a sawmill on the tract of land a year after he acquired the title, or about January, 1934. At the time Egle acquired the title, none of the Sperling heirs were in possession of the property, except Wesley Sperling, who lived in the house which was located on the property at the time of the tax sale. Of course, if Wesley Sperling retained adverse possession of this house and the tract of land, his possession would inure to the benefit of the other coheirs.
 

 “The record is clear that Wesley Sperling knew that Egle obtained a deed to the property from the tax purchaser. He also knew that Egle contemplated putting a sawmill on this property. He admits that Egle did put his sawmill on the property about a year after he acquired the property. Not only did Wesley Sperling acknowledge the possession of Egle in building and operating a sawmill on the tract of land, but he actually worked for Egle in this sawmill during all the time that it was in operation on the property. More-ever, Wesley Sperling acknowledged to various persons that Egle was the owner
 
 *503
 
 of the land and the house in which he (Sperling) lived.
 

 “Wesley Sperling went out and got timber for Egle to use in building the sawmill on the land and helped cut a ditch on the land to use in getting timber to the sawmill, and Egle paid him for this work. Egle testified that he furnished shingles to put on this house where Sperling lived, fixed the steps and furnished new sills and fence posts, and used one of the rooms in the house in which to store tools for use at the mill, all with the full knowledge and acquiescence of Wesley Sperling and without any claim on his part that he and his co-heirs owned the property. It is also shown that Sperling requested Egle to cut the house in two parts so as to give more room; also that in 1934, the W. P. A. built a sanitary toilet for this house, and Sperling told the foreman to see Egle as the house belonged to him, and the latter furnished the material used by the W. P. A. in building this sanitary toilet. Egle paid the taxes on the property from the time he secured the title, and none of the Sperling heirs during this time made any effort to get possession of the property.”
 

 Based upon the foregoing facts the Court of Appeal announced its conclusion as follows :
 

 “Under these circumstances, we can hardly conceive of any other acts of possession and ownership Egle could have exercised over this property than he did from the early part of 1934 to March 23, 1939 a period of over five years. His possession was not only adverse and hostile to any claims that the Sperlings might have asserted, but his possession was with the full consent and approval of Wesley Sperling, the only one of the heirs who could pretend to have retained possession of the property after the tax sale as the representative of the other heirs so as to suspend the running of prescription.” 8 So.2d at page 383.
 

 It is contended on behalf of the relators that, in addition to Wesley Sperling, another of the Sperling heirs, Surral Sperling, resided on the property for two years, that is,- from 1933 to 1935, during the period it is claimed the prescription was accruing. It is argued that Surral Sperling occupied the property for himself and for his coheirs and that the possession exercised by him as well as by Wesley Sperling, inured to their coheirs. These contentions were considered and disposed of adversely by the Court of Appeal in its opinion rendered on the rehearing of the case. After stating that a further review of the facts had confirmed the former conviction of the majority members of the Court that the Sperling heirs had failed to adduce the proof required to show the kind of possession which the law requires to toll the prescription claimed, the Court remarked as follows:
 

 “The most that they have shown is that Wesley Sperling, one of the heirs, continued to occupy a house on the property and that on one occasion, Surral Sperling, another of the heirs, returned to the property and stayed at the same house with his brother for a considerable period of time. Wesley Sperling’s occupancy of the house he lived in was in the nature and capacity of an employee of Egle, who all during that
 
 *505
 
 time conducted a small sawmill business on the property. Neither Wesley Sperling, nor any other of the heirs, ever made any claims or pretentions of ownership of the property except the conversation Wesley Sperling had with a representative of the Atchafalaya Levee Board after that Board had appropriated a portion of it for public purposes, and what representations may have been made were never communicated to Egle. Otherwise, Wesley Sperling’s action, instead of indicating or manifesting any claim of ownership of or control over the property, seemed on the contrary, to disclaim ownership, all as is also pointed out in the majority opinion heretofore handed down.”
 

 An examination of the record satisfies us that at the time Surral Sperling returned to the property he was merely paying a visit to his brother, Wesley Sperling, and not with a view of occupying the property under a claim of ownership. The evidence shows that Surral Sperling was married in 1933 and shortly after his marriage he went to live with his brother, Wesley Sperling, because he was out of work, while his wife remained in Iberia Parish where she was working. Sperling testified that he did not take his wife with him on his visit to Wesley Sperling because times were so tight he could not afford to take her with him and that she stayed with her mother. He further testified that every week while residing with Wesley Sperling he visited his wife who never resided in Morgan City. Surral Sperling never at any time claimed he owned any interest in the property. He stated that so far as the property was concerned, he left that to his brother because everyone could not rule. Nevertheless, he further stated that his brother never told him anything about the property and he did not ask him about it. In other words, he showed a total lack of interest in the property until the Levee Board had agreed to pay Egle $1100 for a right of way over a portion of the property. Under these circumstances, there is no substance to the argument that the short period during which Surral Sperling, while out of work, resided on the property while a visitor to his brother, Wesley Sperling, amounted to a continuous protest against the tax sale forming the basis of Egle’s title.
 

 Relators contend that the Levee Board appropriated the property on October 13, 1937, and that as Wesley Sperling was then protesting his ownership his possession from that time on was hostile to Egle’s claim of ownership and was within five years from the date of the tax sale which took place on November 26, 1932. But there is nothing in the record to show that Wesley Sperling was notified or was advised of the adoption by the Levee Board, on October 19, 1937, of the resolution to appropriate the property. The only claim of ownership made by Wesley Sperling was on the occasion when H. G. Grace, Chief Inspector of the Atchafalaya Levee Board, went out on the property appropriated by the Levee Board for the purpose of adjusting the claims of the various owners. Grace testified that all arrangements looking to the appropriation of the property in question were made with Egle as owner of the property and not with Wesley Sperling who was not consulted about the matter at all. On the occasion referred to, Wesley
 
 *507
 
 Sperling approached Grace and told him that he, Wesley Sperling, and not Egle, owned the property. Grace, in reply, stated to Wesley Sperling that he would have to produce some papers to show that he was the owner of the property, but Sperling never at any time produced the papers, and, .apparently, never pursued the matter further until he and the other Sperling heirs filed their answer and reconventional demand in this suit.
 

 The testimony does not affirmatively show, as contended by relators, that the incident referred to by Grace occurred in October, 1937. On the contrary, Grace’s memory regarding the incident was extremely uncertain. He first testified that he was not sure whether the conversation with Wesley Sperling took place in October or November, 1937. Later on he stated that he thought the conversation took place in the latter part of 1937, which could mean that it took place in December, 1937. On cross-examination, Grace finally stated that he thought Egle had signed the agreement with the Levee Board when he was “contacted by Wesley Sperling.” If the conversation between Grace and Wesley Sperling took place after Egle signed the agreement with the Levee Board, then it must have occurred after August 18, 1938, which was the date on which the notarial act evidencing the agreement between Egle and the Levee Board was executed. And it is certain that whatever representations as to his ownership were made by Wesley Sperling to Grace they were never communicated to Egle. Under these circumstances, we do not find that the Court of Appeal erred in holding on its original hearing that “such indefinite and extrajudicial oral claims could not meet the requirements that a ‘proceeding to annul’ the tax sale must be instituted within five years.”
 

 Relators make a point of the statement contained in the dissenting opinion that “the most favorable situation for Egle is to state that there was dual occupancy of the premises.” The Court of Appeal disposed of this contention in its opinion on rehearing in the following words: “It was the Sperlings’ actual corporeal possession that counted, and that possession must have been one by which they exercised some claim of exclusive dominion over the property; a claim which, as stated in the decisions already cited herein, amounted to a continuous protest against the tax sale from which Egle derived his title.” We find no fault with the statement of the Court of Appeal. It is amply supported by the evidence in the record. Egle’s occupancy of the property was as owner by virtue of his purchase of the property from Dr. DeGravelle. Wesley Sperling’s occupancy of the property was subject to the ownership of Egle which he recognized as pointed out in the opinions of the Court of Appeal. Wesley Sperling clearly indicated his position as to the ownership of the property when he refused to pay any taxes on the property; when he refused to pay for the material used in the construction of the sanitary toilet on the property; when he told Boudreaux, the representative of the W.P.A. which built the sanitary toilet, to see Egle as he, Wesley Sperling, did not own the property; when he told McElroy to ask Egle to cut the house in two parts so as
 
 *509
 
 to give him more room; when he requested Egle to repair the house, and permitted him to use one of the rooms for the purpose of storing tools for the use of his sawmill which, without objection, he allowed Egle to erect on the property; when he was employed by Egle in the sawmill and also to dig a ditch on the land to be used in getting timber to the sawmill, and, finally, when he told Moxley that he used to own the property, but that it had been sold for taxes and now belonged to Egle, who let him stay on the property without paying any rent.
 

 On the other hand Egle indicated his position as to the ownership of the property by exercising exclusive dominion over it from the date of his acquisition. His possession of the property was open, continuous and antagonistic to any claim of ownership by the Sperling heirs or any one else.
 

 Relators argue that when Wesley Sperling rebelled, his possession became hostile to that of Egle and that Egle’s remedy was to take proceedings to dispossess him. Relators, in connection with their argument, refer to a letter dated June 15, 1938, written at the request of Egle by Charles A. Bibbins to Wesley Sperling demanding that he pay a monthly rental of $5 for the occupancy of the house in which he was residing. 'Relators argue that, in view of the letter, Egle can not be held to deny the possession of Wesley Sperling since a person would not attempt to collect rent from another person who was not enjoying possession of the property for which the rent is sought to be collected. But the clear im-. plication of the letter is that the possession of Wesley Sperling was that of a tenant and not that of an owner. At the time the letter was written, the rights of the respective parties had been established. Egle testified that he did not demand that Wesley Sperling pay him rent prior to the date of the letter because Sperling was working for him and also acted as a watchman on the place.
 

 Finally relators contend that as the tax sale took place on November 26, 1932, and the 1.40-acre tract was appropriated on October 19, 1937, the Sperlings were prevented by paramount authority from acquiring possession of the property within the prescriptive period of five years. In the first place, while the resolution of the Levee Board appropriating the property was adopted on October 19, 1937, the property was not actually taken possession of by the Levee Board until after the five year prescriptive period had run. In the second place, the appropriation of the 1.40-acre tract did not preclude the Sperlings, from asserting their ownership of the remaining portion of the property.
 

 For the reasons assigned, the judgment of the Court of Appeal is affirmed.
 

 O’NIELL, C. J., recused.