69 So.2d 96 (1953)
SCHELLER
v.
GOODE.
No. 3630.[*]
Court of Appeal of Louisiana, First Circuit.
March 19, 1953.
Rehearing Granted May 4, 1953.
*97 Plauche & Stockwell, Lake Charles, for appellant.
Lawes Cavanaugh & Hickman, Lake Charles, and Craig Magee & Spann, Mansfield, for appellee.
ELLIS, Judge.
This is a suit to annul and set aside a tax sale made by the Sheriff and Ex-Officio Tax Collector of the Parish of Calcasieu on May 25, 1945 for the unpaid taxes of 1944 levied and assessed against Lot 6 of C. B. Hempton's Subdivision of the west 2 acres of Lot "A" of Gray, Nuchols and Weeks Subdivision, part of Southeast Quarter of Northwest Quarter of Section 33 Township 10 South, Range 10 West. The basis for plaintiff's claim to annul the tax sale is set forth in her petition as follows:
VII.
"Petitioner would further show that the pretended tax sale and the purported deed issued thereunder, is and was null, void and of no effect, and conveyed no title to the said I. J. Goode, of said land, for the following reasons, to-wit:
"A. That no valid or legal notice of delinquency and of the intention to sell said property was issued, mailed or delivered to petitioner, the owner of said property, nor was such notice issued, mailed or delivered to anyone prior to said attempted sale by the said H. A. Reid, Sheriff and Ex Officio Tax Collector, prior to said sale or the execution of said deed, as required by law as a judicial prerequisite to such sale.
"B. Petitioner would further show that the said H. A. Reid, Sheriff and Ex Officio Tax Collector, failed and neglected to make up and file and to record a proces verbal of the sending of the notices mailed, or purported to be mailed, to Anna Flagg, to petitioner, or any other delinquent tax payer for delinquent taxes due by them for the year of 1944, as required by law."
VIII.
"Petitioner would further show that on September 20, 1943, petitioner's mother, Anna Moseley Flagg, executed an oil, gas and mineral lease upon said land in favor of Chas. H. Lawrence, Jr., a resident of Calcasieu Parish, Louisiana, as per oil, gas and mineral lease recorded October 4, 1943, in Conveyance Book 358, page 504; and the said Chas. H. Lawrence, Jr., assigned said oil, gas and mineral lease to the Union Oil Company of California, as per assignment filed for record October 7, 1943, as per File No. 301992, and recorded October 13, 1943, in Conveyance Book 358, page 580; and the said Union Oil Company of California and the Union Sulphur Company and J. C. Wynne, a resident of Smith County, Texas, on November 13, 1943, as per agreement filed for record on December 9, 1943, recorded in Conveyance Book 363, page 359 of the Conveyance Records of Calcasieu Parish, unitized the above lease hereinabove referred to executed by petitioner's mother, Anna Moseley Flagg, in favor of Chas. H. Lawrence, Jr., along with other leases covering porperty in W½ SE¼ NW¼ Section 33 Township 10 South Range 12 West, consisting of Unit A and Unit B, each containing twenty (20) acres, respectively, including the property owned by petitioner, and that under said oil, gas and mineral lease executed by petitioner's mother, Anna Moseley, Flagg, said oil companies went in actual physical corporeal possession of said property, under the terms of said lease, and prior to and *98 at the time of said tax sale, and ever since, has been producing oil from the lot of ground owned by petitioner hereinabove described as: Lot 6 of C. Burt Hampton Subdivision of West 2 acres of Lot A of Gray Nuchols and and Weeks Subdivision of Part of SE¼ NW¼ Section 33 Township 10 South, Range 12 West, Louisiana Meridian, and have regularly paid petitioner, prior to said tax sale and at the time of said tax sale, and since, a regular monthly royalty accruing to her under the terms of said lease; and that the actual physical corporeal possession exercised by the said Union Oil Company of California and the said Union Sulphur Company of petitioner's lot of land was by virtue of said lease."
IX.
"Petitioner would further show that the Union Oil Company of California under the terms of said lease which had been assigned to it by Chas. H. Lawrence, Jr., and under the unitization agreement between it, Union Sulphur Company and J. C. Wynne, constructed roads over and across said unitized area, built slush pits prior to and at the time of said tax sale, and ever since, were using Lot 6 of C. Burt Hampton Subdivision of West 2 acres of Lot A of Gray, Nuchols and Weeks Subdivision of Part of SE¼ NW¼ Section 33 Township 10 South Range 12 West, Louisiana Meridian, by constructing drainage ditches thereon which carried waste from said oil wells over and across said lot and said actual physical corporeal possession has been continued by said lessee, Union Oil Company of California and has been apparent on the surface of said ground prior to and at the time of said tax sale and ever since said tax sale and its actual physical possession of said land was open, peaceable and as owner of said oil, gas and mineral lease."
Plaintiff further alleged that she had tendered to the defendant tax purchaser the price of adjudication, together with all taxes paid by him, together with ten per cent per annum interest thereon, which tender was refused.
The defendant filed an answer in which he denied the nullity of the tax sale and plead the peremption or prescription of three and five years in bar to any attack on the tax sale.
Judgment was rendered in the court below in favor of the plaintiff as prayed for and the defendant has appealed.
Defendant makes the following contentions:
1. That the tax sale dated June 13, 1945 is regular in form and was properly recorded on June 20, 1945, and that since more than five years has expired from the date of the recording of the sale, it is not subject to attack on the grounds set forth in plaintiff's petition.
2. That plaintiff has failed to sustain the burden of proof that she was in and remained in actual, corporeal possession of the property after the date of the sale so as to permit her to attack the tax sale even though more than five years has elapsed from the date of the recording of the sale.
3. That the sale is legal and regular and that proper notice was given as requested by law.
There is little dispute over the facts in this case, however, the main question is in the application of the law to the facts. It is shown that Lot 6 of the C. B. Hampton Subdivision measures 66 feet square, and on January 1, 1944 was owned by Mrs. Anna Moseley Flagg who, during 1944, died and her succession was opened in the parish of De Soto and her daughter, Mary Wortley Scheller, by judgment was recognized as her heir and placed in possession of the property on September 5, 1944. This judgment was filed in Calcasieu Parish on September 7, 1944, and duly recorded. The lot in question was assessed in 1944 to Mrs. Anna Moseley Flagg and the taxes for that year were not paid and, therefore, on March 21, 1945 the Sheriff and Tax Collector sent a registered notice of delinquency *99 addressed to Anna Flagg at Vinton, Louisiana, which notice was returned to the Tax Collector with the reason checked on the return envelope "Unknown." No further effort or steps were taken by the Sheriff and Tax Collector, and the property was duly advertised and sold on June 13, 1945, to the defendant, I. J. Goode, for the unpaid taxes of 1944, and he has paid taxes on the lot from 1945 to 1951 under an assessment to him. The plaintiff has never paid any taxes on the property.
Under the facts in this case the notice was defective, as it has been held that a notice to a dead person is no notice at all, and that the owner of the property at the time the notice was given, in this case the plaintiff, as the sole child and heir of Mrs. Flagg, was the tax debtor entitled to the notice. The Supreme Court in Federico v. Nunez, 173 La. 957, 139 So. 18, 21, made the following statement:
"Having reached the foregoing conclusion, we now come to the defects alleged to exist in the tax sale. One of these defects, as we have said, is the failure to give notice of intention to sell for the taxes due. There is no complaint of the fact that the assessment was made in the name of a dead person, as if such person were alive. In fact, there was no ground to base such a complaint upon, for, although Lorenzo Federico, the husband and father of plaintiffs, died some eight years before the assessment was made, no written notice of his death, and whether or not his succession had been opened, and, if opened, when and where, was given by the parties interested in the assessor. The assessment, therefore, although in the name of an owner, who died pending his ownership, was valid. Section 25 of Act No. 170 of 1898 [LSA-R.S. 47:1965, 47:1995].
"It does not follow from this, however, that notice, mailed to one who is dead, is a compliance with the law. The Constitution of 1921, under which the tax sale was made, provides that the tax collector, before proceeding with the sale, shall give `notice to the delinquent in the manner provided by law.' Const.1921, art 10, § 11. The law, in obedience to this constitutional requirement provides that printed or written notices, in the county parishes, shall be sent by the tax collector, by registered mail, to the `taxpayer.' The word `delinquent,' appearing in the Constitution of 1921, as also in similar phrases in preceding Constitutions, means the owner at the time of issuing the notice. * * *
"The tax collector, in the case before us, sent notice, by registered mail, addressed to `Lorenzo Federico, New Orleans, La.' No street number was given. It does not appear whether the notice was returned to the tax collector or not, for some of his records, including returned notices, were destroyed in a flood. But be that as it may, while Federico was a resident of New Orleans at the time of his death and for some years prior thereto, nevertheless, as he was dead, he was no longer the owner of the property, but his widow and heirs were, and notice addressed to him was not notice addressed to them. Besides, it is obviously impossible to notify a dead person. A notice, addressed to a person who is dead, is equivalent to no notice at all. Our conclusion is therefore that the sale was made without giving the notice required by the Constitution and the laws of this state. Hence, the sale is null."
See also Wilkerson v. Wyche, 158 La. 596, 104 So. 381; In re Interstate Land Co. v. Doyle, 118 La. 587, 43 So. 173; Antoon v. Wilkinson, 6 La.App. 242. Jackson v. Lamb, 4 La.App. 523. Kohlman v. Glaudi, 52 La.Ann. 700, 702. Millaudon v. Gallagher, 104 La. 713, 715, 29 So. 307. George v. Cole, 109 La. 816, 33 So. 784. Boagni v. Pacific Imp. Co., 111 La. 1063, 1068, 36 So. 129. Jackson v. Wren, 36 La. Ann. 315.
*100 The Constitution, Article X, Section 11 provides: "No sale of property for taxes shall be set aside for any cause except on proof of payment of the taxes for which the property was sold prior to the date of the sale, unless the proceeding to annul is instituted within six months from service of notice of sale * * * and within five years from the date of the recordation of the tax deed, if no notice is given."
Another exception has been added to the jurisprudence to the effect that a tax sale may be set aside in cases where it is shown that the tax debtor or his heirs, has remained in actual, corporeal possession of the property, and as the tax sale was made on June 13, 1945 and this suit was not filed until more than five years after the sale, it is necessary that the plaintiff prove that she has remained in actual, open, corporeal possession of the property, and this is the main issue presented on this appeal.
In the Board of Com'rs for Atchafalaya Basin Levee Dist. v. Sperling, 205 La. 494, 17 So.2d 720, 722, the Supreme Court reiterated the kind and nature of possession required to operate as a suspension of the prescription involved in this case by stating:
"As more than five years elapsed between the recordation of the tax deed and the filing of the answer and reconventional demand of the Sperling heirs attacking the tax sale in this suit, it follows that the judgment of the Court of Appeal is correct, unless, as contended by the Sperling heirs, the running of the prescription has been suspended by reason of the occupancy under a claim of ownership of the property by either one or more of the tax debtors. This is the crucial question which must be determined in the case.
"As pointed out by the Court of Appeal in its opinion on the rehearing of this case, reported in 12 So.2d [41] at page 42: `The kind and nature of possession required to operate as a suspension of the prescription involved, is that of a corporeal detention of the property. Levenberg v. Shanks, 165 La. 419, 115 So. 641, 642. In that case it is also stated that "no other possession than actual corporeal possession is sufficient to operate as a continuing protest against the tax title, and thereby prevent the peremption from accruing." And in Tensas Delta Land Co. v. Anders, 158 La. 94, 103 So. 522, 523, it seems to be made the burden of the one claiming such possession to support it by sufficient and competent proof, for it is therein stated: "In this case defendants (who held the position of the plaintiffs in the present case) must prove that the tax debtor or his heirs were in possession of the property when the Constitution of 1898 was adopted, and that they have since remained in continuous possession thereof, to avoid the effect of the three years prescription (now five years) pleaded by plaintiff."'
"Therefore, in order to interrupt the running of the prescription of five years pleaded by Egle, the burden is on the Sperling heirs to show actual corporeal possession by which they exercised some claim of exclusive dominion over the property, a claim operating as a continuing protest against the tax title held by Egle. * * *"
It is shown that the plaintiff's mother, Anna Moseley Flagg, executed an oil, gas and mineral lease on this lot of ground on September 20, 1943 to Charles H. Lawrence, Jr., who assigned the lease to the Union Oil Company of California on September 29, 1943, and this latter company, J. C. Wynne, operating as the Bering Company, and the Union Sulphur Company, Inc., on November 13, 1943 under the rights granted them by the terms of the lease, unitized and pooled oil, gas and mineral leases covering 20 acres of land described as W½ of SE¼ of NW¼, Section 33 T 10 S R 12 W, and under Paragraph II, divided the area into two units, to wit:
*101 Unit Aconsisting of the NW of SE of NW, Section 33 Township 10 South, Range 12 West.
Unit Bconsisting of the SW of SE of NW, Section 33 Township 10 South, Range 12 West, each of the operating units consisting of 10 acres more or less.
The lot involved in this suit is located in Unit A, and it is further shown that four oil wells were drilled on Unit A, commencing on December 28, 1943, and the first was completed as a producer on January 21, 1944, the second was completed September 24, 1945, the third completed November 5, 1945, and the fourth completed February 7, 1946, however, none of these wells were actually drilled upon the lot in question. Oil has been produced from these wells on the unitized area A continuously since the completion of the first well, and the plaintiff's mother prior to her death received royalty payments and subsequently, plaintiff received royalty payments until a short time before this suit was filed. The closest distance to a producing well on Unit A to the lot is 250 feet, and the closest well on Unit B is 265 feet. It is further shown that the oil companies built a shell road which is not at any point actually located on the lot in question but runs within 35 feet of it and is located between producing oil wells in Units A and B. While a plat made by R. E. Oxford, Surveyor, reveals an old drainage ditch crossing the lot in question and another crossing the southeast corner thereof, the evidence shows that this land was once used for a rice farm and these drainage ditches were dug at that time and not by the plaintiff or the oil companies.
It is further shown by the record that there are no visible boundaries nor improvements of any nature upon this lot of ground. Counsel for plaintiff in his brief poses the following question: "While the pipes and machinery to draw the oil from underneath the plaintiff's lot is not physically located on the surface of plaintiff's lot, and neither the shell road constructed by the oil companies is located thereon, does the act of the oil companies in extracting and draining oil from underneath the Lot, and paying the plaintiff and her mother, an oil royalty payment for each month since production commenced up until a short time before this suit was filed constitute possession in plaintiff sufficient to toll the prescription or peremption of five (5) years to cure the defect in the tax sale by failure of the Tax Collector to serve a notice on plaintiff?"
It is the contention of the plaintiff that she has exercised the only actual possession for which the lot of land could be used since the execution of the oil, gas and mineral lease and the production of the oil from the unitized area. She further contends that the voluntary unitization in accordance with the terms of the various leases has the same legal effect as if the area had been ordered unitized by the Conservation Commission and the drilling in the unitized area restricted under the Commissioner's orders, for under Paragraph II of the private agreement between the parties to unitize it is specifically provided that the agreement was made to "efficiently and economically operate the unitized area for the production of oil, gas and other minerals, and to insure to all the parties their fair and equitable share of any such mineral recovered from the land."
Section 9 of Act 157 of 1940 (now Section 10, LSA-R.S. Title 30) reads as follows:
"Agreements for drilling units; pooling interests; terms and conditions; expenses
"A. When two or more separately owned tracts of land are embraced within a drilling unit which has been established by the commissioner as provided in R.S. 30:9B, the owners may validly agree to pool their interests and to develop their lands as a drilling unit.
"(1) Where the owners have not agreed to pool their interests, the commissioner shall require them to do so and to develop their lands as a drilling unit, if he finds it to be necessary to *102 prevent waste or to avoid drilling unnecessary wells.
"(a) All orders requiring pooling shall be made after notice and hearing. They shall be upon terms and conditions that are just and reasonable and that will afford the owner of each tract the opportunity to recover or receive his just and equitable share of the oil and gas in the pool without unnecessary expense. They shall prevent or minimize reasonable avoidable drainage from each developed tract which is not equallized by counter drainage.
"(b) The portion of the production allocated to the owner of each tract included in a drilling unit formed by a pooling order shall, when produced be considered as if it had been produced from his tract by a well drilled thereon.
"(c) In the event pooling is required, the cost of development and operation of the pooled unit chargeable by the operator to the other interested owners shall be limited to the actual reasonable expenditures required for that purpose, including a charge for supervision. In the event of a dispute relative to these costs, the commissioner shall determine the proper costs, after notice to all interested persons and a hearing."
We agree with the plaintiff's contention that the above statute is read into every drilling and pooling unit created either by private contract or by order of the Conservation Commissioner. It is well to note that under the above cited authority if minerals are produced from the unit, they are allocated to the owner of each tract included in the drilling unit and when produced are considered as if they have been produced from each of the tracts by a well drilled thereon.
The record does not show any acts of corporeal possession by plaintiff's mother, Mrs. Anna Flagg, nor by the plaintiff after her acquisition unless as contended by the plaintiff, the acts committed by the lessee in the exercise of the servitude was or constituted actual corporeal possession or detention of the land so as to amount to the exercise of exclusive dominion over the property by the plaintiff.
It is defendants contention that where the well was not drilled on the property in dispute nor the road for ingress and egress built thereon, that the unitization and pooling of the 10 acres for a drilling unit could not be considered the kind and nature of corporeal possession required under the law, even though Section 10 LSA-R.S. Title 30, supra, stated that any oil produced off of the tract included in the drilling unit shall be considered as if it had been produced from each separately owned tract in the unit. We will accept the law literally and will, therefore, consider the question as if a well had been drilled on the lot in question and a road for ingress and egress had been built thereon and the oil actually produced from under the lot.
It is well-settled that a lessee under Article 3432 of the LSA-Civil Code does possess the mineral servitude by the exercise of that right, i. e., by conducting drilling operations, and it is also well-settled, as we interpret the jurisprudence, that at the same time an owner can be in actual open, corporeal possession of the land, referred to as surface possession, and that these two possessions do not conflict or prevent each from holding such possession, separate and apart from the other.
In the case of Connell v. Muslow Oil Co., 186 La. 491, 172 So. 763, 764, the subject of separate possession was presented to the Court. The Natalie Oil Company was the owner of 80 acres of land and of the mineral rights therein including a producing oil well which it had drilled, and it sold the 80 acres of land but reserved from the sale all of the mineral rights in the land and the producing oil well with all of the machinery and equipment belonging thereto. The vendee of the Natalie Oil Company sold the land without mentioning in the deed that the mineral rights in the land had been reserved by the Natalie Oil Company, and this vendee in turn sold 40 acres of land to Mr. W. E. McDade without any reservation of or mention of the mineral rights, *103 and he in turn sold the same 40 acres to the plaintiff, Connell, without any reservation or mention of the mineral rights in the land. Connell claimed by the prescription of 10 years acquirendi causa the mineral rights in the 40 acres of land which he owned. The judge of the District Court found that Connell had had actual possession of the surface of the 40 acres of land for a period exceeding ten years preceding the filing of the suit, and the Supreme Court accepted that finding as correct in considering the case. The lower court rejected the plaintiff's demand, basing its decision upon the fact that the Natalie Oil Company and its successors in title had retained possession, continuously except for the period of 18 months, of the servitude which was created by the sale made by the Natalie Oil Company to its vendee with reservation of the mineral rights. The Supreme Court in affirming the judgment of the Lower Court stated:
"No well was drilled on the N.W. ¼ of S.E. ¼ of Sec. 10 [Plaintiff's land] during the period exceeding seventeen years after Connell bought the land. The Natalie Oil Company and its successors in title, however, have retained possession of the mineral rights, or servitude, on the whole 80 acres of land, in the only way that the law provides for the exercise of the right of possession of a servitude, or an incorporeal right. Article 3432 of the Civil Code provides:
"`The possession of incorporeal rights, such as servitudes and other rights of that nature, is only a quasi possession, and is exercised by the species of possession of which these rights are susceptible.'
"It is conceded that the suspending of the operation of the oil well for the period of only eighteen monthsor for any period less than ten yearswas not enough to cause the Natalie Oil Company or its successors in title to lose their servitude by the liberative prescription of ten years, for non-use. It is not disputed that the exercise of the servitude, by the operating of the oil well, was open and notorious, and apparent to every one in the neighborhood. There was the derrick, the pumping rig, oil tanks, and other apparatus, and trucks hauling materials to the well; all of which was obvious to every one in the vicinity, and the passers-by. W. E. McDade, testifying as a witness in the case, admitted that he knew that the mineral rights were claimed by some one else when he bought the 40 acres from Sam Willer and Julius Gamm. McDade admitted that Gamm told him, at the time of the sale, that some one else claimed the mineral rights in the land; and McDade admitted that, when he sold the 40 acres to Connell, he told Connell that he, McDade, did not know whether he owned the mineral rights, and that he told Connell that he was transferring only such rights as he had. It is not likely that Connell believed that he was acquiring the mineral rights when he bought the 40 acres of land from McDade, because the deed in which the Natalie Oil Company had reserved the mineral rights on the whole 80 acres was then only five years old. Whether Connell did or did not actually know that the Natalie Oil Company owned the mineral rights in the 80 acres of land, at the time when Connell bought the northern 40 acres from McDade, is a matter of no importance, in our view of the case. The important fact is that the Natalie Oil Company and its successors in title, by exercising their mineral rights, or servitude, upon a part of the 80 acres of land, protected the servitude on the whole 80 acres against loss by prescription."
In the case of In re Mt. Forest Fur Farms of America, 122 F.2d 232, 243, the United States Circuit Court of Appeals for the Sixth Circuit reviewed extensively the law of Louisiana, recognizing that mineral rights are subject to actual possession, adversely to the possessor of the land itself, by the exercise of such rights, meaning the actual drilling operations and all *104 other acts necessary and incidental thereto. In this case the Court stated that "It is manifest from Connell v. Muslow, supra, that possession of a mineral servitude is independent of possession of the surface by the owner of the land."
The courts have in effect held on the question of separate possession of the mineral servitude and the surface of the land that all the acts necessary for the exercise of the servitude, such as placing a derrick, pumping rig, oil tanks and other apparatus, building a road, that is, ingress and egress to the site of the drilling operation, are not considered as affecting one in open, corporeal possession of the land, commonly referred to as surface possession. Such acts are committed by the lessee solely and exclusively for the purpose of reducing to possession the minerals. We realize that the acts of a lessee inure to the benefit of the lessor, however, that which inures to the benefit of the lessor is the possession of the mineral servitude, and if not a dry hole secure to him his retained portion of the minerals produced by the lessee and interrupt liberative and acquisitive prescription which would otherwise affect the mineral servitude.
The case of International Paper Co. v. Louisiana Central Lumber Co., 202 La. 639, 12 So.2d 659, 660, was a jactitation suit in which the plaintiff admittedly was the owner and actual possessor of approximately 10,000 acres of land and alleged that the defendants were slandering its title to the oil, gas and other mineral rights in the land, and plaintiff claimed to have possession of the mineral rights by having possession of the land itself. It further plead that whatever mineral rights the defendants may have had were extinguished by non use, by the prescription of ten years liberandi causa. The Supreme Court said:
"It is well settledand not disputed that a jactitation suit, or an action for slander of title, can be maintained only by one who is in actual possession as owner, and only against one who is not in possession, of the property the title to which is sought to be quieted. South Louisiana Land Co. v. Riggs Cypress Co., 119 La. 193, 43 So. 1003; Labarre v. Burton-Swartz Cypress Co., 133 La. 854, 63 So. 380; Miller v. Albert Hanson Lumber Co., 134 La. 225, 63 So. 883; Siegel v. Helis, 186 La. 506, 172 So. 768; Rudd v. Land Co., 188 La. 490, 177 So. 583; Allison v. Maroun, 193 La. 286, 190 So. 408; City of Shreveport v. Kahn, 194 La. 55, 193 So. 461. * * *
"The only question in this case therefore is whether the plaintiff, International Paper Company, was in actual possession as owner of the mineral rights in dispute,and consequently whether the defendant, Louisiana Central Oil & Gas Company, was not in adverse possession of these rightsat the time when this suit was filed.
* * * * * *
"The plaintiff depends upon the rule that one who has possession of the surface of a tract of land as owner may maintain a jactitation suit against one who slanders the possessor's title by claiming mineral rights in the land. But that rule has its qualifications, one of which is that if the possessor of the land holds under a deed which on its face excepts the mineral rights, or if the so-called slanderer holds a recorded deed for the mineral rights, the possessor of the surface of the landin order to maintain his jactitation suit must allege and make a prima facie showing that the outstanding claim of the slanderer for the mineral rights has been extinguished by the prescription of ten years liberandi causa. In such a case the possessor of the surface as owner of the land cannot maintain a jactitation suit against a defendant who has a recorded deed for the mineral rights if the defendant is actually and adversely possessing or exercising the mineral rights. Mineral rights and mineral leases are by Act 205 of 1938 [LSA-R.S. 9:1105] `defined and classified as real rights and incorporeal immovable property, and may be asserted, protected and defended in the same *105 manner as may be the ownership or possession of other immovable property by the holder of such rights'. It is declared in article 3432 of the [LSA-] Civil Code that possession of incorporeal property, such as servitudes, is had by the exercise of such rights. See Connell v. Muslow Oil Co., 186 La. 491, 172 So. 763; Allison v. Maroun, 193 La. 286, 190 So. 408; and In re Mt. Forest Fur Farms of America, Inc., 122 F.2d 232, where the United States Circuit Court of Appeals for the Sixth Circuit reviewed extensively the law of Louisiana recognizing that mineral rights are subject to actual possession, adverse to the possessor of the land itself, by the exercise of such rights."
The case of Allison v. Maroun, 193 La. 286, 190 So. 408, 410, presented the question of whether an owner of a mineral lease may maintain an action for slander of title without having possession of the leased premises, basing his right of action upon the possession held by the lessor. In this case the plaintiff had a mineral lease on 40 acres of land which his lessors actually possessed as owners. The lessee had never exercised any right of possession. The Supreme Court in considering the question stated:
"But for the act of 1938 there would be some doubt whether a mineral lease is susceptible of such possession as to permit the lessee to maintain an action for slander of title. We say this because in article 3432 of the [LSA-] Civil Code it is declared that possession applies properly only to corporeal property, either movable or immovable, and that the possession of incorporeal rights, such as servtiudes, is only a quasi possession, and is exercised by the species of possession of which these rights are susceptible. See Connell v. Muslow Oil Co., 186 La. 491, 172 So. 763. The kind or species of possession of which a mineral lease is susceptible, or the way in which the lessee may exercise his right of possession, is by drilling or exploring for the minerals, and taking possession of such as he may discover. In deciding the present case, therefore, it may be assumed that a holder of a mineral lease may, under the provisions of Act No. 205 of 1938, maintain an action for slander of his title, if he is actually exercising his right of possession of his `incorporeal immovable property.' But the act of 1938 does not exempt the holder of a mineral lease from the condition that he must be in possession of his `incorporeal immovable property' in order to maintain an action for slander of title; the statute does not allow him to base such a right of action upon the possession held by his lessor."
Thus, again the Supreme Court recognized and approved its former holding that one may be in actual, open, corporeal possession of the land, that is, the surface rights, which is the kind of possession that the plaintiff in this case must show in order to prevent prescription from barring her action, and a lessee may be in possession of his mineral servitude by virtue of his drilling operations on the land.
In the case of Lenard v. Shell Oil Co., Inc., 211 La. 265, 29 So.2d 844, 847, the plaintiff was the owner and in actual possession of 30 acres of land in which he claimed that as a possessor of the land he was also possessor of the minerals under the prescription of 10 years acquirendi causa. He alleged that the defendants who had a mineral servitude on approximately 80,000 acres of land of which his 30 acre tract formed a part, were slandering his title by claiming the mineral servitude on this thirty acres. The Court found that "On the facts of the case, the defendants were in actual possession of the mineral servitude, according to the provisions of the [LSA-] Civil Code and the jurisprudence on the subject. * * *" In conclusion the Court stated:
"Our conclusion is that the exercise of the mineral servitude by the defendants or their lessees by drilling in search of oil or gas on a part of the larger tract of land which was affected by the mineral servitude and which embraced the 30 acres owned and possessed by the plaintiff in this *106 case prevented him from acquiring the mineral rights on his 30 acres by the prescription of 10 years acquirendi causa, notwithstanding none of the drilling operations were conducted on his 30 acres of land."
In its per curiam, it also stated:
"By the use of the word `severed' we did not intend to say that two estates of corporeal property had been created. A reading of the opinion in its entirety shows that what we intended to say, and did say, is that the error in the judgment appealed from is in the omission to observe that the act creating the mineral servitude made possible two possessions of the property, i. e., the possession of the mineral servitude and the possession of the land itself, and hence that the mineral servitude was subject to possession and was in fact possessed by the owner thereof adversely to the owner of the 30 acres of land."
See also Allison v. Wideman, 210 La. 314, 26 So.2d 826.
The effect of the exercise of the servitude is the interruption of prescription acquirendi or liberandi causa, and the reduction of the mineral servitude to the possession of the lessee. The actual facts necessary to exercise the servitude have not been considered as interfering with or adding anything to the surface possession held by the owner of the land. All acts necessary for the lessee to exercise his servitude are limited in their effect and can only be considered as affecting the mineral servitude.
We cannot reconcile the plaintiff's contention that by these acts of the lessee in order to possess the mineral servitude she is exercising exclusive dominion over the land as owner with the cases, supra. These cases have recognized the ownership and the open, corporeal possession of the land so as to constitute exclusive dominion over the surface of the land in one person and possession of the mineral servitude in another (the lessee). If an act by the lessee is not necessary and incidental to the purposes for which the lease was granted, that is, in order for him to exercise his servitude, then he is committing an act of open corporeal possession of the surface outside the terms of the lease. If we are to consider the drilling of the well, etc., as being acts which would constitute open, corporeal possession of the surface of the land, then we agree with defendant's contention that they would have to be committed on the lot in question, otherwise we would be holding that it is not necessary for the owner to actually possess the land in question in order to toll the prescription, or it could easily be a case of an owner attempting to sustain his title under the ten year good faith possession by virtue of a lessee having drilled on other property in a drilling unit not owned by the one asserting prescription.
For the reasons given, the judgment of the District Court is hereby reversed and the plea of prescription is hereby sustained and the plaintiff's suit dismissed at her cost.
DORÉ, Judge (dissenting).
Under the facts as found by the majority of this court, I am of the opinion that the judgment appealed from is correct and should be affirmed.
The cases cited by the majority opinion are not applicable to this case. In this case the lessor is also the owner of the surface rights. Furthermore, the questions of prescription acquirendi causa or liberandi causa relative to mineral rights are not involved as they were in all the cases cited and depended upon by the majority of this court for its conclusion.
Article 3433 of the LSA-Civil Code states: "One may possess a thing not only by one's self, but also by other persons." The Article then gives examples, thusly: "Thus the proprietor of a house or other tenement possesses by his tenant, or by his farmer; the minor, by his tutor; and, in general, every proprietor, by the persons who hold the thing in his name."
*107 In the case of Bright v. Bell, 113 La. 1078, 37 So. 976, the Supreme Court states: "Possession of the lessee is the possession of the lessor".
It cannot but be said and in fact it is admitted in the majority opinion that the lessee in this case was in the actual physical possession of Unit A, a part of which is the 66 foot square lot involved in this litigation, prior to, at the time of, subsequent to the tax sale and up to the filing of this suit, and was and has been exercising its rights to explore and search for oil and did bring in four producing wells. Under Section 9 of Act 157 of 1940 (now Section 10, LSA-R.S. Title 30) such exploration and production are considered as if they had been done and produced on the 66 foot square lot in question. The same can be said of the roads, pipe lines and drainage structures. The Supreme Court, in the case of Tyson v. Spearman, 190 La. 871, 183 So. 201, 208, states that "such rights as the lessee may have acquired by virtue of his possession inures to the benefit of his lessor." Thusly, the actual physical possession of the said 66 foot square lot, under Article 3433 and the cases supra is said to be that of its lessor, the owner thereof, that is, Mrs. Anna Moseley Flagg, the mother of plaintiff and thereafter the plaintiff. Considering the size of the lot, if plaintiff or her mother had attempted to take actual physical possession of this lot in any manner, her lessee could have prevented her from so doing in that it would have been an act of disturbing its possession. Considering the size of the lot, I cannot see, for the life of me, how the plaintiff, or her mother, could have had the open corporeal possession of this lot under the circumstances of this case, and not interfere with the corporeal possession of her lessee. The possession of her lessee was her possession. To hold otherwise would create a hiatus. In other words, according to the decision of the majority, the plaintiff, through her lessee, has had the actual, physical corporeal possession of the minerals, as owner, ever since production on January 21, 1944, and that the tax sale was void as to the minerals in that the minerals had been reduced to possession but the sale was not void as to the surface rights of the lot. I cannot subscribe to such a holding and respectfully dissent.
NOTES
[*] Compromised whilst pending on rehearing.